Docket No. 85625–Agenda 4–March 2000.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. MICHAEL WILLIAMS, Appellant.

Opinion filed May 25, 2000.

JUSTICE FREEMAN delivered the opinion of the Court:

Following a trial in the circuit court of Cook County, a jury convicted defendant Michael Williams of first degree murder, aggravated kidnaping, and armed robbery (720 ILCS 5/9–1(a), 10–2(a)(3), 18–2 (West 1992)). At a separate sentencing hearing, the same jury found defendant eligible for the death penalty and found that there were no mitigating factors sufficient to preclude imposition of that sentence. The trial judge accordingly sentenced defendant to death on the murder conviction and consecutive 30-year prison terms on the aggravated kidnaping and armed robbery convictions. Defendant’s death sentence has been stayed pending direct review by this court. Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d Rs. 603, 609(a). For the reasons which follow, we affirm defendant’s conviction and death sentence.

BACKGROUND

On January 12, 1994, Estelle Jones attended a party at the home of Anthony “Bruce” Smith in Gary, Indiana, with her cousins Angela King and Karolyn Summers. In the early morning hours of January 13, Jones drove King and Summers home, then left to return to Smith’s party. Jones’ relatives reported her missing when she failed to return, and the police found her body later that day, in a deserted lot in Riverdale, Illinois. Medical testimony revealed that her death was the result of a gunshot wound to the head, which had been inflicted by a shotgun fired at close range. The car she had been driving was found approximately a month later, in a wooded area in east Gary. It had been burned, and the remains of a gasoline can were found inside it.

Smith testified as follows. Among the other people at his party were his half brother, Curtis “Junior” Hosea; his uncle, James “Puko” Thompson; and his friends David Carroll and Chelsea Golden. The victim and her friends arrived around 11:30 p.m. They left after a few hours, but the victim returned to the house approximately one hour later, after having dropped her friends off at home. Smith and the victim went to Smith’s bedroom and became sexually involved. While in the bedroom, Smith heard the doorbell ring and heard the voices of defendant and Dennis Moreland.

Smith had a “business relationship” with defendant and Moreland in which Smith was paid $150 per week to sell cocaine for the two men. Accordingly, when Smith heard their voices, he left the bedroom and let the men into the house. Smith, defendant and Moreland returned to the bedroom. There, in the presence of the victim, defendant and Moreland inventoried Smith’s supply of cocaine. After determining that everything was in order, they replaced the cocaine and money in a small bag which was left in the bedroom. Defendant and Moreland then joined the party. Shortly thereafter Smith left the bedroom, to use the bathroom. The victim, whom Smith had left alone in the bedroom with the bag containing the drugs, “jumped” when he returned. When he asked her what was wrong, she simply stated that Smith had startled her.

A few minutes later, Smith heard the doorbell ring again. Defendant knocked at the bedroom door and said a customer had arrived. Smith gave defendant the bag containing the drugs and closed the bedroom door. Less than a minute later, Smith heard defendant shout “Hell, no,” and Smith exited the bedroom to see what was the matter. Defendant told Smith several rocks of cocaine and some powder cocaine were missing from the bag. After Smith denied taking the drugs, defendant, Smith and Moreland returned to the bedroom, searched the victim, and discovered that she had hidden approximately $50 worth of drugs in her sock.

Moreland pulled a 9-millimeter handgun out of his waistband and pointed it at the victim, but Smith convinced him not to shoot her. However, when Smith went to the kitchen to talk with defendant and Moreland, defendant told Chelsea Golden to “beat” the victim. Golden grabbed a wine cooler bottle and attacked the victim with it. As the two were wrestling, defendant stepped in and began punching the victim in the face. Moreland continued the beating after defendant stopped. Hosea, Carroll and Thompson also hit her once or twice. During the beating, Golden took off the victim’s shoes. As defendant and Moreland were hitting the victim, they said that she had “violated” and had to be punished. Defendant suggested that the victim should perform oral sex on everyone present. Moreland and defendant then separately went into the bedroom with the victim. While defendant was in the bedroom with her, Smith heard scuffling and heard the victim screaming no and saying “stop.”

After defendant exited the bedroom, he and Moreland went to the kitchen to talk, and Smith followed. He heard Moreland tell defendant to “do something about this here” because the victim could “jeopardize our spot” if she went to the police and reported that she had been assaulted at the house. Defendant agreed, and moved the victim’s car to the rear of the house. When he re-entered the house, Moreland told him not to worry about anyone “snitching,” because if anyone did, everyone in the house would be in trouble. Moreland flashed a “pitchfork,” which Smith testified was a gang sign for the Disciples street gang, and used the term “folks,” which Smith testified was another name for the Disciples. Defendant went into the bedroom and carried the victim out over his shoulder, with a pillowcase over her head. He brought her outside and put her in the trunk of her car. Moreland got a shotgun Smith kept in his house and gave it to defendant, telling him not to worry because Moreland would kill anyone who said anything. Defendant took the shotgun, got into the victim’s car, and drove off. Moreland made a call on a cellular phone and, a short while later, a white car pulled up to the house. Moreland said “those are my folks,” made the pitchfork symbol, and got into the car with the men and drove away. Several hours later, defendant returned to the house to retrieve the victim’s shoes and jacket. When Smith asked him what he had done with the victim, defendant replied that he had “smoked” her. Smith also overheard a later conversation between Moreland and defendant in which defendant told Moreland that he had taken the victim’s car to the east side of Gary and burned it and that he had buried the shotgun.

Defense counsel cross-examined Smith extensively regarding statements he made to the police shortly after the murder. When Smith first talked to the police he said that the victim had not come back to the house after leaving with her cousins. Smith subsequently admitted that the victim had returned, but stated that defendant had committed all of the physical violence. On redirect examination Smith testified that he had initially lied to the police because of defendant and Moreland’s threat to kill anyone who said anything about what had happened.

Hosea, Golden, and Carroll’s testimony corroborated Smith’s version of events, but these witnesses added that Hosea had used the victim’s car to get cigarettes and drive Thompson home while defendant and Moreland were in the bedroom with the victim. They also stated that they heard the victim pleading for help as defendant carried her from the bedroom to the trunk of her car. The witnesses recalled seeing the 9-millimeter handgun in Moreland’s possession, although Carroll testified that defendant was handling the gun when the men first entered the house. None of these witnesses recalled having seen a shotgun at the house during the party.

Riverdale Police Officer Michael Horn participated in a search of Smith’s house after the murder. Horn testified that he recovered three guns during the search, one of which was a 9-millimeter handgun. Horn testified that after the police impounded the weapons, defendant told Horn that the 9-millimeter handgun was his and asked Horn how to retrieve it.

Deputy Commander Edward Davies of the Lake County, Indiana, sheriff’s department testified that he spoke with defendant on two occasions. First, on March 8, 1994, defendant voluntarily spoke with Davies about the crime for approximately one hour. He was not arrested, and he left the police station after the interview. Later on March 23, defendant was arrested for the crime, and he spoke with Davies again. Davies transcribed a statement defendant made concerning the crime.

In his statement, which was introduced into evidence, defendant recounted the following version of events. He had gone to Smith’s house around 2 or 3 a.m.; he did not mention Moreland being with him. A customer had come to the door and defendant got the drugs to make the sale from Smith, who was in the bedroom with a woman. Defendant noticed that the “count” was not right, and told Smith so. Smith then talked to Thompson
 and searched him in the bathroom, after which Smith said that “that bitch must got [
sic
] it.” Smith then searched the girl he had been with in his bedroom and found the drugs in her possession. Smith and Thompson began to slap her, Golden hit her with a bottle, and then everyone started hitting her. Defendant admitted that he, too, hit the victim, but stated that he only did so because he believed that she had hit him while she was being beaten by the others.

Smith suggested that the victim perform oral or sexual intercourse with the men. Defendant admitted that the victim performed an act of oral intercourse on him after she had done so to Thompson. The other men then resumed beating the victim, while defendant went outside to her car to verify her claim that Smith had previously given her drugs, some of which were in the car. When defendant returned, a person, “James or Mike,” knocked the victim unconscious with a skillet. Defendant did not know James/Michael’s actual name, but stated that he was “some kin to” Smith. Once the victim was unconscious, everyone began to talk about what had occurred and the trouble that it could cause. Someone pointed out that the victim “just can’t leave.” Eventually it was agreed that she should be taken to Chicago and killed there. James/Michael gave defendant a shotgun after the group arrived at this decision, then told defendant to put the victim in the trunk of her car and to meet him at “Archibee’s.” Defendant picked James/Michael up at Archibee’s, and they drove the victim’s car to Riverdale, where James/Michael decided to commit the murder. Defendant held the shotgun while James/Michael got the victim out of the car. After he gave the gun back to James/Michael, defendant asked him if they were doing the right thing, to which James/Michael replied that they would “talk about that later.” Defendant reentered the car, and heard a gunshot as he turned the key in the ignition. The men drove the victim’s car back to Gary and defendant left the car with James/Michael, who said he would take care of it and the gun.

The defense called Karolyn Summers, who testified that she was at the party at Smith’s house on the evening of January 12. While there she had seen a shotgun near the table where people were playing cards. She testified that other people had seen the shotgun as well–in fact, they were playing with it. The defense also introduced a stipulation that, in prior testimony, Golden had stated that Smith had told her he had thrown the victim’s shoes away because the police were investigating his house.

Following closing arguments, the jury returned general verdicts finding defendant guilty of first degree murder, aggravated kidnaping, and armed robbery. At the eligibility phase of sentencing, the jury found defendant eligible for the death penalty on the basis of two statutory aggravating factors: first, that defendant committed the murder with the intent to prevent the victim from giving “material assistance” to law enforcement authorities in an investigation or prosecution; and second, that the murder was committed “in a cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design to take a human life by unlawful means” and defendant’s conduct “created a reasonable expectation” that the victim’s death would result. See 720 ILCS 5/9–1(b)(8), (b)(11) (West 1994). The case proceeded to the aggravation-mitigation phase.

The State presented testimony in aggravation concerning defendant’s behavior in Cook County jail while awaiting trial. In September 1995, all of the inmates on defendant’s cell tier, including defendant, jammed their cell doors open, an incident for which those inmates were disciplined. The State also established that defendant had been disciplined for a physical altercation with another prisoner on November 3, 1994.

Other evidence in aggravation included testimony by the victim’s mother, Birdia King, who read a prepared victim impact statement regarding the emotional impact the victim’s death had on her and her family. The State also demonstrated that it was at least a 30-minute trip from Smith’s house in Gary to the location where the victim was found, evidence intended to show that defendant had more than sufficient time to change his mind.

The State also offered in aggravation the testimony of Leon Anderson, an inmate at the Illinois Department of Corrections. He stated that he had shared a cell with defendant at Cook County jail while he was awaiting trial and had regular contact with him for a total of 10 to 12 months. Defendant told Anderson that he was a “regent,” or chief of security, for the Gangster Disciples before being incarcerated and he continued in this role in jail. Defendant controlled the weapons and drugs that ran through Division One–the maximum security division of the jail–and had the power to order “violations,” or beatings, for infractions of gang rules. On at least nine separate occasions while they were cellmates, Anderson had personally seen defendant beat other inmates, the earliest such incident being in December 1994.

Defendant told Anderson that he had “shot a girl in the face” and that he was concerned about his codefendant informing on him. Defendant said he would have his codefendant killed if he did so. Defendant also told Anderson that he was trying to get money together to have the other witnesses in the case killed.

Anderson admitted that he was a member of a gang which was a rival of defendant’s gang. He further admitted that because one of the offenses for which he was currently incarcerated was predatory aggravated criminal sexual assault of a child, the State’s Attorney had the power to institute proceedings within one year of his release date to have him held indefinitely as a predatory offender. However, Anderson testified that he had been promised nothing in exchange for his testimony. He stated that he was testifying because “[t]hat could have been my sister.”

The State also called Sergeant Bennett of the Cook County department of corrections. Bennett, who worked in Division One of the Cook County jail, knew defendant when defendant was in the jail and was aware that defendant was one of the leaders in his gang. Bennett did not know defendant’s exact rank, but stated that defendant did have the power to call violations. However, on cross-examination, Sergeant Bennett testified that defendant had not been “hanging with the gangs” for approximately the last 18 months. Defendant had adjusted to incarceration and was “institutionalized,” 
i.e.
, was an “ideal inmate, knows the rules and regulations and abides by the rules, no problems.”

In mitigation, defendant first called Dr. Douge Barthelemy, his pediatrician. Dr. Barthelemy testified that defendant was born with a rare incurable neurological/dermatological condition known as Sturge-Weber disease. The main effect of this disease was a port-wine-colored stain on the face, one side of the upper chest, the neck, pharynx, mouth, brain and brain covering, or meninges. The disease was progressive, and caused a gradual asphyxiation of that portion of the brain which it covered, leading to the death of that part of the brain. The affected area of the brain controlled several functions, including discrimination and judgment. Defendant also had a condition called Blount disease, which caused severe bowing of his legs.

Pastor Thomas Nelson testified that he had known defendant since he was four years old, and that defendant had always been an active participant in church and church activities. Defendant was very cordial and polite, would do whatever was asked of him, and did not misbehave. Pastor Nelson counseled defendant when defendant was teased about his facial deformity and his limp. He stated that things were difficult for defendant because he was in the “shadow” of his very successful older brother, S.T.

Pastor James Wetzstein testified that he had known defendant since December 1993, when Pastor Nelson’s church closed and defendant’s family transferred to his congregation. He often visited defendant in prison after his arrest and testified that defendant was “filled with remorse” for what had happened to the victim. Defendant was also very upset about what his family was going through. Pastor Wetzstein admitted on cross-examination that defendant never admitted having killed the victim; he merely expressed remorse for the part he had played and for what had happened to the victim and her family.

Another mitigation witness, Johnny Robinson, knew defendant from working with him at Bethlehem Steel. He stated that defendant was a good worker who would do whatever was asked of him. Robinson also associated with defendant outside of work, enjoying such activities as fishing and movie-going. He felt defendant was a good person, who was also very polite. He admitted on cross-examination that defendant never talked about his gang involvement with him.

Defendant’s mother testified as follows. Defendant was always helpful around the house and worked with her at several of her jobs, cleaning and/or cooking. Defendant was a “follower,” in that he would “give in” to his family or friends if they asked him to do something. Defendant never had trouble making friends, because he was very generous with them and would “share whatever he had.” Defendant’s four-year-old son enjoyed talking to defendant and always asked about him, even though defendant was already in jail when his son was born. The witness did not believe that defendant was a gang member or that he ever had been one.

Defendant’s older brother, Pastor S.T. Williams, testified that defendant had problems in school from an early age. He was a slow learner and often missed school because of his medical conditions. Defendant often expressed frustration about his medical conditions to his brother when they were growing up. Pastor Williams testified that both he and defendant were very involved in church activities during their youth. Although defendant did not finish high school, he obtained certifications in both building maintenance and carpentry through Job Corps. After obtaining his certifications, he was steadily employed until the events of this case.

Defendant also introduced evidence that the only disciplinary reports he had received while incarcerated in Cook County jail were those previously described, one for fighting and one for jamming his cell door.

The jury found that there were no mitigating factors sufficient to preclude the imposition of the death penalty. Accordingly, the trial court sentenced defendant to death on the murder charge. This appeal followed.

Additional relevant facts will be discussed in the context of the issues raised on appeal.

ANALYSIS

Defendant raises several issues on appeal. They may be separated into arguments pertaining to the guilt phase of trial and arguments relating to the propriety of his death sentence.

Guilt Phase of Trial

Ineffective Assistance of Counsel

Defendant first argues that he received ineffective assistance of counsel during the guilt phase of his trial. His argument is based on counsel’s contentions in opening and closing argument that the statement defendant gave to police was truthful and accurate. Defendant argues that this concession was tantamount to a complete abandonment of a defense, because if the statement were true, the jury would have had no choice but to convict defendant of kidnaping, armed robbery and murder.

In making this argument defendant contends that the appropriate standard for assessing counsel’s conduct is provided by 
United States v. Cronic
, 466 U.S. 648, 80 L. Ed. 2d 657, 104 S. Ct. 2039 (1984), and 
People v. Hattery
, 109 Ill. 2d 449 (1985). Unlike the familiar two-part test from 
Strickland v. Washington
, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), which requires a defendant to establish both a deficiency in counsel’s performance and prejudice resulting therefrom, 
Cronic 
requires a court to presume that counsel’s error, if established, was prejudicial. The presumption is properly invoked when, for example, “counsel entirely fails to subject the prosecution’s case to meaningful adversarial testing, [which constitutes] a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable.” 
Cronic
, 466 U.S. at 659, 80 L. Ed. 2d at 668, 104 S. Ct. at 2047. This court applied the 
Cronic
 standard in 
Hattery
, in which defense counsel conceded in opening statement his client’s guilt to murder charges, did not introduce any evidence at trial, and did not make a closing argument to the jury.

In the instant case 
Strickland
, not 
Cronic
 and 
Hattery
, supplies the appropriate standard for assessing trial counsel’s performance. In 
People v. Shatner
, 174 Ill. 2d 133 (1996), and 
People v. Chandler
, 129 Ill. 2d 233 (1989), this court concluded that 
Strickland
, rather than 
Cronic
, provided the proper test for evaluating a defendant’s claim of ineffective assistance of counsel. Like defense counsel in the present case, counsel in 
Shatner
 and 
Chandler 
admitted the veracity of a statement in which the client admitted participation in a felony in the course of which a victim was killed, but denied having been the actual killer. In both cases, we rejected the argument that this concession was tantamount to a total lack of meaningful adversarial testing.
 Hattery
 was distinguished on the basis that counsel in 
Hattery
 completely and unequivocally conceded defendant’s guilt, whereas in
 Shatner
 and 
Chandler
 counsel only conceded what defendant had admitted to the police, but submitted the ultimate question of guilt to the jury. Thus there was no “breakdown of the adversarial process” as described by the Supreme Court in 
Cronic
. As in 
Shatner
 and 
Chandler
, the instant case did not lack an adversarial character. Defense counsel aggressively cross-examined the State’s witnesses, argued for a not-guilty verdict on murder and armed robbery in opening and closing statements, and moved to suppress defendant’s statement during pretrial proceedings.

After rejecting the 
Cronic
 analysis, the 
Shatner
 and 
Chandler
 courts went on to determine whether defense counsel’s conduct constituted ineffective assistance according to the traditional standard enunciated by the Supreme Court in 
Strickland v. Washington
, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), and adopted by this court in 
People v. Albanese
, 104 Ill. 2d 504, 525-26 (1984). As this court summarized the test in 
People v. Todd
, 178 Ill. 2d 297 (1997):

“To prevail on a claim of ineffective assistance, a defendant must establish both that counsel’s performance was deficient and that the deficiency was prejudicial. 
Strickland
, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. Judicial scrutiny of counsel’s performance is highly deferential, and a court considering an allegation of ineffective assistance ‘must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance.’ 
Strickland
, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.

Even if counsel’s performance is objectively unreasonable, however, relief is not automatically warranted, for a defendant must also show that he was prejudiced as a result of counsel’s deficient performance. ‘An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.’ 
Strickland
, 466 U.S. at 691, 80 L. Ed. 2d at 696, 104 S. Ct. at 2066. To establish prejudice, ‘[t]he defendant must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.’ 
Strickland
, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. Because a defendant must establish both a deficiency in counsel’s performance and prejudice resulting from the alleged deficiency, failure to establish either proposition will prove fatal to the claim. 
Strickland
, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069; 
People v. Harris
, 164 Ill. 2d 322, 349 (1994).” 
People v. Todd
, 178 Ill. 2d 297, 324-25 (1997).

Defendant argues that even if this case is not governed by 
Cronic
, our 
Strickland
 analysis should follow 
Chandler
, in which we found counsel’s performance ineffective under 
Strickland
 because the jury could have found defendant not guilty “only if it had chosen to disregard the jury instructions.” 
Chandler
, 129 Ill. 2d at 247. However, as we have since noted, the determination in 
Chandler
 that counsel was ineffective was not based simply on counsel’s apparent failure to comprehend the law of accountability. See 
Shatner
, 174 Ill. 2d at 147; 
People v. Page
, 155 Ill. 2d 232, 267-68 (1993). Rather, we found that counsel’s misapprehension of accountability had infected the entire conduct of the trial, resulting in counsel conducting no cross-examination of several key prosecution witnesses and only cursory cross-examination of others, and calling no witnesses himself. 
Chandler
, 129 Ill. 2d at 248-49.

The instant case is more analogous to 
Shatner
 than 
Chandler
. In 
Shatner
, after having determined that counsel’s conduct should be judged by the 
Strickland
 standard, rather than 
Cronic
, we found that defendant had failed to establish ineffective assistance. In 
Shatner
, as here, counsel conceded the truth of his client’s statement admitting his involvement in a crime, but claiming that an accomplice actually killed the victim. However, counsel cross-examined witnesses in order to challenge their alternate version of events, and argued that although defendant might be guilty of the underlying felony, he should not be convicted of murder because of his minimal involvement in the scheme. This court noted that

“it was the defendant’s own statements, *** and not the actions or strategy of his counsel, which undermined any claim of innocence that defendant may have had. If a defendant enters a not-guilty plea in the face of overwhelming evidence of his guilt, we are unwilling to find that his counsel was ineffective simply because he failed to contrive a leak-proof theory of innocence on defendant’s behalf. To do so would effectively require defense attorneys to engage in fabrication or subterfuge.

*** It is apparent that defense counsel sought to convince the jury that defendant’s minimal involvement in the scheme warranted either a finding of innocence or a conviction for robbery only. While this strategy was risky, it was strategy nonetheless, and perhaps the only strategy which could have been seriously pursued given defendant’s admissible incriminating statements and the overwhelming evidence of his guilt. Defendant now contends that his trial counsel should have presented a reasonable doubt theory, i.e., defendant played no role whatsoever in the [robbery]. However, it is arguable that that strategy would have been even less credible and less likely to succeed than the one his attorney actually pursued. Under the circumstances of this case, defense counsel’s performance was not deficient with respect to his proffered defense theory.” 
Shatner
, 174 Ill. 2d at 148.

Here, too, defendant was convicted by his own statement, not by his counsel’s struggles against the substantial evidence against him. Defendant maintains that 
Shatner
 is distinguishable because counsel’s statement in the instant case conceded not only defendant’s guilt, but also his eligibility for the death penalty. We disagree. In 
Shatner
 the defendant argued that counsel’s concession of the accuracy of his statement admitted felony murder, although it did challenge the charges of intentional and knowing murder. 
Shatner
, 174 Ill. 2d at 144. This court found that any argument by defense counsel against defendant’s eligibility for the death penalty would have been “doomed to fail” because the general guilty verdict against defendant meant defendant was guilty of felony murder. 
Shatner
, 174 Ill. 2d at 149-51. Thus in 
Shatner
 just as here the statement established not only defendant’s guilt but also his eligibility for the death penalty. 
Shatner
 cannot be distinguished on this basis. We therefore reject defendant’s claims of ineffective assistance.

Handgun Evidence
(footnote: 1)
 Defendant also maintains that the trial court erred in allowing Riverdale Police Officer Michael Horn to testify regarding the guns and ammunition found during the search of Smith’s house and about defendant’s claim of ownership of the 9-millimeter handgun. Defendant contends that since this gun was not used in the murder, its introduction only served as evidence of his “bad character,” which is impermissible and entitles him to a new trial.

The State notes that defendant did not object to this evidence at trial or in his post-trial motion, and thus the issue has been waived for review. Defendant acknowledges that the issue was waived, but contends that we should reach the issue under the plain error exception to waiver. See 134 Ill. 2d R. 615(a).

It is well established that plain error will be invoked in criminal cases only “where the evidence was closely balanced or the error was of such magnitude that the accused was denied a fair trial.” 
People v. Alvine
, 173 Ill. 2d 273, 292 (1996). Neither of these factors is present in the guilt phase of the instant case. The evidence of guilt was not closely balanced. Four separate eyewitnesses testified that defendant agreed with his codefendant’s suggestion that he had to “do something” so that the victim did not “jeopardize” their drug operation. Defendant, in possession of a shotgun, then drove off in the victim’s car with the victim in the trunk, with a pillowcase over her head. The victim was found dead from a shotgun wound to the head hours later, still wearing the same pillowcase. Moreover, defendant himself confessed to all of the above; his only defense was an attempt to shift responsibility for the actual shooting to a stranger he had met at the party whom he had picked up in the car after driving away from the house. In light of this evidence, we do not consider the case to have been closely balanced. 
Alvine
, 173 Ill. 2d at 292. Nor, as we explain below, was any error in the introduction of this evidence “of such magnitude that the accused was denied a fair trial.” 
Alvine
, 173 Ill. 2d at 292. Indeed, we believe there was no error in introducing the evidence.

First, as the State notes, the defense elicited the fact that the 9-millimeter weapon was found during the search during cross-examination of Smith before Officer Horn testified. On cross-examination, defense counsel questioned Smith about the search of his house in January 1994:

“Q. [Defense Counsel:] And the Riverdale Police came in, you were there. Remember that?

A. [Smith:] Yes, sir.

Q. And they searched your house. Remember that?

A. Yes, sir.

Q. Do you remember them recovering a 9 millimeter pistol under your mattress?

A. That belongs to [defendant], which [
sic
] he stated that it was his gun.

Q. So, you do remember them recovering a pistol?

A. I don’t know about recovering, but they said there was gun [
sic
] there and the only gun that was there was the one that [defendant] had.”

A criminal defendant cannot complain on appeal of the introduction of evidence which he procures or invites. 
People v. Payne
, 98 Ill. 2d 45, 50 (1983); 
People v. Menssen
, 263 Ill. App. 3d 946, 951 (1994).

Moreover, even had defendant not opened the door to the introduction of this evidence, we would see no error in its introduction. All of the witnesses testified to seeing Moreland in possession of a 9-millimeter pistol at the house, and the fact that such a weapon was recovered there buttressed their version of events. Further, at least one witness, Carroll, testified that defendant, not Moreland, had the gun in his possession when the men first entered the house. Even had he not, all of the witnesses’ testimony was to the effect that defendant and Moreland were working together. The fact that defendant had claimed ownership of a gun of the same type as that seen in Moreland’s possession would thus tend to support the State’s case. For these reasons, plain error does not excuse defendant’s procedural default of this issue.

Closing Argument

Defendant also contends that he was denied a fair trial by the purportedly improper closing argument by the prosecution in the guilt phase of the trial. Accordingly, he contends that his conviction must be reversed and the cause remanded for a new trial. Defendant refers specifically to the following remarks by the prosecution in the rebuttal portion of close:

“As he came back [after the murder] he intimidated the witnesses just as he intimidated the witnesses now.

* * *

Ladies and gentlemen, he chose the witnesses. Ladies and gentlemen, he chose you. But there’s one thing different about, collectively, the jury and the witnesses, and that’s because he cannot intimidate all of you sitting there.

Ladies and gentlemen, he fears you. And the reason he fears you is because you will hold him responsible.

* * *

Well, ladies and gentlemen, the victim is not alone right now, because you have the right, the responsibility, to hold the defendant to justice. *** By doing that you will show the victim that she is not alone, and you will show the defendant that you are to be feared.”

The State responds that this claim has been waived due to defendant’s failure to both object to the arguments at trial and include it in his post-trial motion. Defendant admits as much, but contends again that we should consider his contentions under the plain error exception to the waiver rule, under this court’s Rule 615(a) (134 Ill. 2d R. 615(a)). We again disagree.

As previously noted, the evidence was not closely balanced. Further, the comments did not deprive defendant of a fair trial. It is well-established that prosecutors are afforded wide latitude in closing argument (
Alvine
, 173 Ill. 2d at 292-93; 
People v. Cisewski
, 118 Ill. 2d 163, 175 (1987)) and may argue facts and reasonable inferences drawn from the evidence (
People v. Kliner
, 185 Ill. 2d 81, 151 (1998)). In reviewing a challenge to remarks made by the State during closing argument, the comments must be considered in the context of the entire closing statements of the parties. 
People v. Wiley
, 165 Ill. 2d 259, 295 (1995). Even if prosecutorial comment exceeds the bounds of proper argument, the verdict must not be disturbed unless it can be said that the remark caused substantial prejudice to the defendant (
People v. Williams
, 164 Ill. 2d 1, 24 (1994)), taking into account “the content and context of the language, its relationship to the evidence, and its effect on the defendant’s right to a fair and impartial trial” (
Kliner
, 185 Ill. 2d at 152). “[E]rrors in opening statements or closing argument must result in substantial prejudice such that the result would have been different absent the complained-of remark before reversal is required.” 
People v. Cloutier
, 156 Ill. 2d 483, 507 (1993). None of the complained-of statements suffer this degree of infirmity. Although there was no direct evidence that defendant had intimidated witnesses during trial, all of the eyewitnesses testified that defendant had been involved in intimidating them at the time of the crime. Smith stated that he initially lied to the police because of the fear engendered by defendant and Moreland’s threats. This alone distinguishes the instant case from prior decisions in which courts have reversed convictions because of witness-intimidation arguments when there was 
no
 evidence of any witness intimidation. 
Cf.
 
People v. Mullen
, 141 Ill. 2d 394 (1990); 
People v. Rivera
, 277 Ill. App. 3d 811 (1996); 
People v. Hood
, 229 Ill. App. 3d 202 (1992).

Arguably the contention that defendant intimidated the witnesses “now” is an acceptable inference from the facts that defendant was involved in threatening to kill the witnesses at an earlier time and that defendant was a high-ranking member of a street gang. It is entirely reasonable that, given these facts, the witnesses might remain intimidated by defendant at the time of trial. Moreover, even if this argument did not constitute a proper inference, the fact that defendant did threaten the witnesses on one occasion established his guilty mind, which is the proper purpose for introducing such evidence. 
People v. Smith
, 141 Ill. 2d 40, 66 (1990). Since defendant’s guilty mind had been established by competent evidence to which defendant makes no objection, defendant could have been prejudiced only slightly by the comment regarding him intimidating witnesses “now” even if it was improper. The State did not, in this argument, suggest that defendant had threatened witnesses with respect to whom there was no evidence of intimidation or coercion.

Defendant argues that reversal is required by this court’s decision in 
Mullen
. 
Mullen
 is distinguishable. In 
Mullen
, the prosecution in closing argument in a close case deliberately and forcefully argued that a witness was afraid of being shot in the back if he testified against defendant. The trial court had previously specifically excluded any mention of the witness’ fear of defendant. We concluded that such a comment was improper and prejudicial because (1) there was “no evidence in the record that defendant in any way threatened or intimidated any witness”; (2) the argument evinced an “egregious” disregard “as to proper argument and the orders of the trial court”; and (3) the evidence of guilt was closely balanced. In the instant case, on the other hand, the record established that defendant 
had
 intimidated the witnesses; the prosecution’s argument did not transgress any court order; and the evidence was not closely balanced. 
Mullen
 is thus distinguishable, and, as we stated in 
Mullen
, “ ‘[e]ach case of this kind must be decided upon its own facts.’ ” 
Mullen
, 141 Ill. 2d at 407, quoting 
People v. Weathers
, 62 Ill. 2d 114, 120 (1975). 
Mullen
 thus does not compel reversal in the instant case.

Nor do we find plain error in any of the other comments of which defendant complains. Rather than contending that the jury should be afraid of defendant, or that defendant might attempt to intimidate the jury members, the remarks clearly suggested the opposite–that the jury should 
not
 be afraid of defendant. It is well established that to exhort the jury to perform its function without fear is entirely proper. 
E.g.
, 
People v. Harris
, 129 Ill. 2d 123, 159 (1989). Nor do we find the prosecutor’s comments that defendant feared the jury to constitute an impermissible attempt to align the jury with the State. Rather, this constitutes a continuation of the theme that the jury should not be afraid of him. None of these remarks rise to the level of plain error. Accordingly, we do not believe that the plain error rule requires this court to excuse defendant’s procedural default.

Sentencing Issues

Disparate Sentences

Next, defendant argues that his sentence of death must be vacated because it is unconstitutionally disparate from the sentence imposed on his codefendant, Moreland, in his separate trial. Moreland was sentenced to a term of 60 years’ imprisonment for murder, with a concurrent 15-year sentence for aggravated kidnaping and a consecutive 30-year sentence for armed robbery.
(footnote: 2)
 Although this court has the duty under both the Illinois and United States Constitutions to ensure that a sentence of death is not imposed arbitrarily or capriciously (
People v. Burt
, 168 Ill. 2d 49, 80 (1995)), there is no constitutional requirement that we engage in comparative proportionality review (
People v. Towns
, 174 Ill. 2d 453, 479 (1996)). Nevertheless, this court has previously chosen to exercise its discretion and consider whether a sentence of death in a particular case is disproportionately harsh in comparison with a less severe sanction imposed on a codefendant convicted of the same crime. 
Towns
, 174 Ill. 2d at 479. In reviewing a death sentence, we examine the facts of the particular case and the evidence introduced at the guilt and sentencing phases of trial. The relevant factors in comparative proportionality review include the offenders’ extent of involvement in the offense, the nature of the offense, the character and background of the offenders, including any criminal record, and their potential for rehabilitation. Similarly situated individuals must not receive arbitrary or unreasonably disparate sentences. 
Burt
, 168 Ill. 2d at 80; 
People v. Kitchen
, 159 Ill. 2d 1, 44 (1994). We will generally not interfere with a trial court’s sentencing determination absent an abuse of discretion, although we are less deferential to the trial court in cases involving a sentence of death. 
People v. Smith
, 177 Ill. 2d 53, 97-98 (1997).

We find no unconstitutional disparity in the sentences imposed on defendant and Moreland because the two defendants were not similarly situated. Defendant suggests they were because Moreland was the ringleader with respect to all of the crimes committed against the victim. However, although Moreland initially pointed a weapon at the victim, told defendant to “do what you got to do” before defendant left to commit the murder, and threatened the witnesses, it was defendant who instigated the actual violence against the victim, by telling Golden to attack the victim and then by intervening and punching the victim repeatedly in the face before Moreland or anyone else. Moreover, the overriding distinction between the two perpetrators is that it was defendant, not Moreland, who carried the victim outside with a pillowcase over her head on a January night, without a coat or shoes, put her in the trunk of her car, drove miles away to a secluded area, and discharged a shotgun into her head at close range, leaving her to die alone on the ground in a deserted lot, the pillowcase still covering her face. This fact alone justifies defendant’s more severe sentence. 
People v. Easley
, No. 84418, slip op. at 29 (_____ 2000)

Defendant argues that the sentencing disparity cannot be “excused” simply because defendant was the actual killer, citing 
People v. Gleckler
, 82 Ill. 2d 145 (1980). 
Gleckler
 is distinguishable. There, this court vacated defendant’s death sentence and remanded for a sentence other than death in light of the fact that others involved in the crime received only terms of imprisonment. However, in that case when the defendant shot the two victims his accomplice had already shot both victims with a shotgun. Moreover, the defendant was in the company of his accomplice, the ringleader, at the time he shot the two victims and there was considerable evidence supporting the defendant’s testimony at trial and sentencing that his accomplice ordered him to shoot the victims, threatening his life if he did not. In the instant case, there was no evidence suggesting that Moreland threatened defendant if he failed to carry out the killing and defendant was acting on his own from the time he drove away from the house through the time he ended the victim’s life with a shotgun in Riverdale. Moreland and defendant are not equally culpable, and defendant’s sentence was not unreasonably disparate to Moreland’s. 
Easley
, slip op. at 29; see also 
People v. Kliner
, 185 Ill. 2d 81, 176 (1998) (sentence of death for defendant not unreasonably disparate to 60-year sentence for codefendant who hired defendant to kill victim)
(footnote: 3) (and cases cited therein).

Evidentiary Rulings During Aggravation-Mitigation Phase

Defendant contends that the trial court erred in two evidentiary rulings during the aggravation-mitigation phase of trial. First, he contends that the court should have barred the State from introducing the testimony of Leon Anderson. Second, he contends the court erred in prohibiting defendant’s mother, Mary Williams, from answering the question, “Can you give the ladies and gentlemen of the jury any reasons why they should spare [defendant’s] life?”

A. Leon Anderson

Defendant contends that the trial court abused its discretion in allowing Leon Anderson to testify over defense counsel’s objection that Anderson’s identity was not disclosed until the day before he testified.

Defendant filed a pretrial motion seeking disclosure of all nonstatutory aggravating evidence which the State would seek to introduce at sentencing. The court entered an order, agreed to by the State, that the State would furnish defense counsel with the names and updated addresses of any witnesses whom it intended to call in aggravation, along with any reports relevant to those witnesses. Before trial, the State informed the court and defense counsel that the State would have no evidence in aggravation beyond evidence of drug dealing by defendant and matters mentioned in jail records which had been tendered to defense counsel. However, the day before closing arguments in the guilt phase of trial, the State mentioned that it would have “different aggravation.”

On the day of closing arguments in the guilt phase, the State revealed that in the aggravation-mitigation phase it would call two witnesses who knew defendant during his pretrial incarceration.
(footnote: 4) The prosecution refused to reveal the witnesses’ names until it could be determined whether they were in protective custody. However, the State agreed to comply with the trial court’s order to begin obtaining disciplinary reports and criminal record sheets immediately, in order to make them available to defense counsel as quickly as possible.

The State did not reveal Anderson’s name to the defense until the day before he testified. On the day Anderson was to testify, defense counsel objected to his testimony on the basis that he had had insufficient time to investigate the witness. The prosecutor explained to the court that the witness had only been located through an “exhaustive search of five years of records” regarding defendant’s cell mates during his confinement. The assistant State’s Attorney informed the court that the first time a representative of his office had interviewed Anderson was that very day, and that the State had tendered all available materials. The trial court refused to bar Anderson from testifying.

Defense counsel then asked for a continuance to investigate Anderson. The State responded that they had tendered to the defense Anderson’s “rap sheets” from both the State of Illinois and the City of Chicago, as well as an appellate court opinion describing the underlying facts of one of Anderson’s convictions. However, the State represented that it would not be possible to obtain his Illinois Department of Corrections records until the next day. The court denied the request for a continuance, but stated that Anderson, who was normally incarcerated in an Illinois Department of Corrections facility in Centralia, would be held overnight in Chicago so as to be subject to recall by the defense the next day. However, after Anderson’s testimony defense counsel stated that Anderson could be remanded to Centralia that evening. The next day, defense counsel informed the court that the State had tendered a disciplinary hearing report on Anderson, but defense counsel did not feel any need to recall Anderson.

Defendant concedes that the Constitution does not entitle defendants in capital cases to discover the evidence the State intends to introduce in aggravation. 
People v. Armstrong
, 183 Ill. 2d 130, 160 (1998); 
People v. Williams
, 147 Ill. 2d 173 (1991). Nevertheless, defendant argues that because the trial court 
did
 enter an order directing the State to disclose such evidence, the court erred in failing to bar Anderson from testifying when the State failed to disclose his name until the day before he testified. We disagree.

A trial court’s rulings on admissibility of evidence in aggravation are reviewed only for abuse of discretion. 
People v. Thomas
, 137 Ill. 2d 500 (1990). We also review only for abuse of discretion any penalty imposed by a trial court for violation of a discovery order. 
People v. Newberry
, 166 Ill. 2d 310, 317-18 (1995). We do not find the trial court to have abused its discretion in refusing to bar Anderson’s testimony when defendant was not constitutionally entitled to the information and there was no showing that the prosecution acted in bad faith in failing to disclose Anderson earlier.

Defendant’s reliance on 
Lankford v. Idaho
, 500 U.S. 110, 114 L. Ed. 2d 173, 14 S. Ct. 1723 (1991), is misplaced. In that case the trial court sentenced defendant to death even though the prosecution had formally stated that it was not seeking the death penalty. See 
Lankford
, 500 U.S. at 119-20, 114 L. Ed. 2d at 183-84, 111 S. Ct. at 1729. The Court held that the proceeding violated defendant’s due process rights because at the sentencing hearing defense counsel was unaware that there was even a possibility that defendant might be sentenced to death, and accordingly made no arguments against such a sentence. 
Lankford
 in no way resembles the case before us, in which defendant merely complains that the trial court punished the prosecution insufficiently for what the record reveals to have been an innocent failure to provide him with information he was not constitutionally entitled to receive. Moreover, defendant has not shown how the abbreviated disclosure inhibited his defense efforts, in that he has not suggested how counsel might have attacked Anderson’s credibility if the State had disclosed him before trial. We find no basis for reversal. 
Cf.
 
People v. Guest
, 166 Ill. 2d 381, 405-06 (1995) (counsel not ineffective for failing to move the State to disclose evidence in aggravation since defense was not constitutionally entitled to discovery and defendant failed to indicate what counsel could have done to challenge the aggravating evidence).

B. Mary Williams

Defendant next argues that the court erred in sustaining the prosecution’s objection when defense counsel asked defendant’s mother if she could “give the ladies and gentlemen of the jury any reasons why they should spare [defendant’s] life.” We find no error. When defense counsel posed this question to the witness, the State objected and a sidebar was called. The trial court sustained the objection and instructed defense counsel that she could not “ask a witness anything with respect to the death penalty. That [means] why he shouldn’t get it, why he should get it, whatever.” The court explained that counsel could elicit facts about defendant from the witnesses and then, in closing argument, argue that the facts constituted mitigating circumstances sufficient to preclude imposition of the death penalty. However, counsel had to structure her questions “without going into why somebody should not get the death penalty which is tantamount to saying do you think the defendant should get the death penalty.”

The trial court’s ruling was correct. A witness’ opinion that a defendant should not be sentenced to death is not admissible at a death penalty proceeding. 
People v. Williams
, 161 Ill. 2d 1, 70 (1994); 
People v. Stewart
, 105 Ill. 2d 22, 67 (1984). Witnesses may testify concerning matters relating to the record and character of the  and the nature and circumstances of the offense, but not as to their opinions regarding the appropriate sentence. This determination is left to the sentencing authority based on the evidence adduced, and a witness’ opinion thus is irrelevant. 
Williams
, 161 Ill. 2d at 70. The trial court drew exactly this distinction in sustaining the State’s objection to the question. A witness giving reasons that a defendant should not be sentenced to death is implicitly arguing 
that
 the defendant should not be sentenced to death. The trial court correctly foreclosed this attempted “end-run” around the rule that witness opinions regarding the appropriate penalty are inadmissible. The court also made clear to defense counsel that the proper procedure was to elicit the facts from the witness and then use closing argument at the aggravation-mitigation phase to show the jury why the facts militated against a sentence of death. Thus, reversal on this ground is unwarranted.

Closing Argument During Sentencing

Defendant next argues that his death sentence must be vacated and the cause remanded for resentencing because of certain remarks by the prosecution during closing argument during the sentencing phase of trial.

We begin our analysis by reviewing the general principles applicable to such claims. Prosecutors are allowed great latitude in their closing arguments, and a trial court’s determination of the propriety of remarks will not be disturbed absent a clear abuse of discretion. 
People v. Byron
, 164 Ill. 2d 279, 295 (1995). The State may comment on the evidence and all reasonable inferences therefrom, and any allegedly erroneous comments must be viewed in context and the argument must be considered as a whole. 
People v. Blue
, 189 Ill. 2d 99, 128 (2000). However,

“ ‘[i]t is of vital importance to society and to the defendant that any decision to impose the death penalty is, and appears to be, based upon reason rather than emotion.’ [Citation.] The death penalty determination must therefore focus on the particular character and record of the defendant. [Citation.] Moreover, because of the qualitative difference between death and other forms of punishment, a high standard of procedural accuracy is required when determining whether the death penalty will be imposed. [Citations.] It is also well settled that parties in closing arguments may not go beyond the evidence presented and inferences therefrom, misstate the law, or express personal opinions on the evidence. [Citation.] In particular, prosecutorial arguments that are calculated to divert the jurors’ attentions from the evidence and play upon their emotions are manifestly improper at a capital sentencing hearing.” 
People v. Woolley
, 178 Ill. 2d 175, 209 (1997).

Defendant makes numerous separate claims of error in the State’s closing argument. However, defendant did not contemporaneously object to many of the arguments of which he now complains, and with respect to those few arguments to which he did object at trial, he failed to raise the points as grounds for reversal in his post-trial motion. It is well established that in order to preserve for appeal an objection to argument in the aggravation-mitigation phase of trial, a defendant must both object contemporaneously and raise the point in his post-trial motion. See, 
e.g.
, 
People v. Buss
, 187 Ill. 2d 144, 239 (1999); 
People v. Nielson
, 187 Ill. 2d 271, 296 (1999). Accordingly, all of defendant’s arguments regarding the State’s closing argument have been waived.

However, defendant contends that we ought to consider his arguments under the plain error doctrine. See 134 Ill. 2d R. 615(a). As previously noted, the plain error rule may be invoked only if the evidence was closely balanced, or the error was of such magnitude as to create a substantial risk that the accused was denied a fair and impartial trial. The second prong of the rule applies “only if the error is so fundamental to the integrity of the judicial process and so prejudicial to the defendant that the trial court could not cure the error by sustaining an objection or instructing the jury to disregard the error.” 
People v. Brooks
, 187 Ill. 2d 91, 136 (1999), citing 
People v. Vargas
, 174 Ill. 2d 355, 363-64 (1996). We shall examine each of the allegedly improper remarks with these principles in mind.

One of defendant’s allegations of error concerns comments by the State that for defendant prison would be like a “Holiday Inn” or a “frat house.” In the opening portion of the State’s closing argument, the prosecutor asked the jury:

“[I]s [imprisonment] an adequate punishment? Three squares, pretty much the run of the room, the day room, the phone; if he wants drugs, he can get those. It doesn’t sound like prison, it sounds like the Holiday Inn. And is this what he’s entitled to; is this what he should–how he should live the rest of his life? That’s ridiculous, it doesn’t make sense.”

And in rebuttal, the prosecutor contended that:

“[H]e walks through the penitentiary system, he walks through the jail, it’s like a frat house, it’s like a frat house of violence. He has security, he’s got unlimited access to the phone, people give him money, people give him marijuana and a hooch, he controls the people. This is not hard time.”

These comments do not constitute plain error. For her “crime” of stealing approximately $50 worth of cocaine, defendant instigated a prolonged, savage beating of the 19-year-old victim, raped her, and threw her in the trunk of her own car, driving her miles away before he discharged a shotgun into her head, leaving her to die in an empty trash-strewn lot in mid-January, a pillowcase over her head. Moreover, it was uncontroverted that defendant had risen to a high rank in his gang, and that he used his power to order beatings of other prisoners while in jail.

Defendant’s mitigating evidence consisted chiefly of testimony that he had been a decent youth who had been teased about his facial deformity and bowleggedness and had recently ceased his gang involvement. As the State notes, there was no testimony that defendant’s case of Sturge-Weber disease had progressed to a point where his judgment was impaired or that any such impairment could have caused him to commit the crime in question. Indeed, defendant’s evidence in mitigation established that he was able to be polite when he desired to be.

The brutal facts of this murder, balanced against the evidence offered in mitigation, render a conclusion that the evidence was not closely balanced. See 
People v. Burgess
, 176 Ill. 2d 289, 321 (1997) (finding aggravating evidence “overwhelming, consisting chiefly of the brutal circumstances of the defendant’s crimes”).

Nor did these comments create any risk that defendant was denied a fair and impartial trial. While colorful, the State’s “Holiday Inn” and “frat house” metaphors were based on the evidence, specifically the testimony of Anderson regarding defendant’s status and the conditions in which he lived while incarcerated in Cook County jail. We see no merit to defendant’s argument that the conditions of his incarceration in Cook County jail cannot form a basis for an argument regarding the conditions he would endure while incarcerated at the Illinois Department of Corrections. It was a reasonable inference that if defendant enjoyed certain privileges or luxuries in one correctional facility, because of his status within the Gangster Disciples, he might enjoy similar privileges or luxuries in other correctional facilities. Plain error therefore does not excuse defendant’s procedural default of this statement.

As with the preceding claim, the remainder of defendant’s claims regarding closing argument are cognizable only as plain error. As we have determined that the evidence in aggravation and mitigation was not closely balanced, we need only consider, for these next several claims, whether defendant was denied a fair and impartial trial such that the second prong of the plain error rule has been met.

Defendant next objects to the State’s contention in closing argument that the jury’s decision was “collective,” rather than, as defense counsel suggested, one the jurors had to make “individually in your hearts and in your conscience.” Again, we find plain error does not excuse defendant’s procedural default. This argument was not prejudicial. First, the argument was in at least some sense correct, in that all jurors had to sign whichever verdict form was to be returned. Second, the State did tell the jury that it was “okay to agree to disagree.” Finally, we believe that any confusion which might have resulted from the prosecution’s argument would have been sufficiently cured by the jury instructions that the jury had to sign and return the verdict form directing the court not to sentence defendant to death unless the jury unanimously found that there was no mitigating factor sufficient to preclude imposition of the death sentence. See 
People v. Towns
, 174 Ill. 2d 453, 472 (1996) (finding no plain error in trial court having told jury during 
voir dire
 that all decisions, including the decision whether to impose the death penalty, had to be unanimous, because jury was properly instructed prior to beginning its deliberations during the aggravation-mitigation phase). Plain error does not excuse defendant’s procedural default.

Defendant further contends that the prosecution exceeded the bounds of proper argument by commenting on the possibility that he might be paroled. In context, the comments of which defendant complains are as follows:

“So this was not some sudden, impassioned reckless act of the defendant. *** In jail he’s looking to kill the witnesses. No witnesses, no crime. He wasn’t in a hurry to go to court, he wasn’t in a hurry to be tried for this murder because the witnesses were still out there. It’s just a matter of finding them and having them killed, that’s the only problem.

Is this the same guy that’s going to be rehabilitated in five, ten, twenty years? Is this the kind of guy that you think is going to walk the streets as a law abiding citizen, or is this a guy that’s beyond reproach [
sic
]. Beyond reproach, he’s beyond help, he’s beyond rehabilitation, ladies and gentlemen. Anyone that can in a cold, calculated manner kill this 19-year old girl for absolutely no reason, no good reason at all, is this someone who is beyond help?”

Again, we do not find plain error. As we have previously noted, “[e]ach instance of error of this kind must be examined on the facts of the case.” 
People v. Pitsonbarger
, 142 Ill. 2d 353, 401 (1990). We believe that the prosecutor’s comments are distinguishable from comments made in cases in which this court has set aside a death sentence. In 
People v. Gacho
, 122 Ill. 2d 221 (1988), upon which defendant relies, a death sentence was set aside because of the prosecutor’s repeated comments on the possibility of parole, though he knew there was no possibility of parole, together with other objectionable comments including one which mentioned the possibility of future violence against guards or other inmates. We held that the repeated comments diverted the jury’s attention from the aggravating and mitigating factors of the case.  
Gacho
, 122 Ill. 2d at 257. See also 
People v. Hooper
, 133 Ill. 2d 469, 500 (1989) (holding improper prosecutor’s speculation that defendant might kill a guard, along with comments concerning parole). In contrast, when the State’s comments in the instant case are viewed in context, we must conclude that the comments were not naked speculation, nor were they immaterial to the jury’s relevant considerations. Given the evidence adduced concerning defendant’s behavior during his pretrial incarceration, defendant’s rehabilitative potential was a proper matter for consideration by the sentencing authority during the aggravation-mitigation phase. See 
People v. Henderson
, 171 Ill. 2d 124, 138 (1996). Moreover, the prosecutor here did not specifically ask the jury to consider the possibility that defendant might be paroled if not sentenced to death. See 
People v. Fields
, 135 Ill. 2d 18, 59 (1990). Finally, these were brief, isolated comments in the context of an opening portion of closing argument which spanned nearly 13 pages of transcript. Thus, while we do not condone these remarks, we cannot conclude that they were of such substantial error as to threaten the integrity of the judicial process or to deny defendant a fair trial so as to satisfy the second prong of our plain error rule.

Nor did the State commit plain error by its brief exhortation to the jury to prevent defendant from “prey[ing] on innocent people.” Although it is improper for the State to make an 
unsupported
 reference to hypothetical future crimes a defendant might commit (
Kliner
, 185 Ill. 2d at 174; 
People v. McNeal
, 175 Ill. 2d 335, 365 (1997)), comment on future dangerousness is proper if based on the evidence (
People v. Johnson
, 146 Ill. 2d 109, 148-49 (1991)). Here there was ample evidence from which to infer that defendant might present a danger to others, including the evidence that he called “violations” on others and that while in jail awaiting trial he had been attempting to effectuate the killing of his codefendant as well as the other witnesses in this case.

Finally, defendant argues it was impermissible for the State to argue that defendant had “manipulated” or “controlled” Sergeant Bennett by “fear” or “terror.” This argument refers to the following comments from the rebuttal portion of the State’s closing argument:

“Ladies and gentlemen, do you really think prison is going to be hard time for him because he intimidates and he controls and he manipulates and, ladies and gentlemen, I’ll even submit to you today that you saw how he can manipulate guards inside the penitentiary system, because you had a guard come in here and talk about he was a gang leader but he doesn’t hang around with the gangs, that he used to call the shots but there is a lot of people that call the shots.

Ladies and gentlemen, there is fear, there is terror, there is control, not only of inmates, but of guards, and that’s a reality.

MR. LEE: Judge, I’m going to object to that.

THE COURT: Overruled. Each attorney may comment on the evidence and inferences to be made from the evidence.”

Although we believe that this argument was improper, we do not believe that it rises to the level of plain error. The record reveals that the comment was an isolated one made in the context of an argument that, as transcribed, consists of over 25 pages. We note that the trial court properly instructed the jury that arguments did not constitute evidence. Given the fact that the remark was not repeated and that the jury was properly instructed as to the function of argument, we cannot say that this error was so egregious as to have denied defendant a fair sentencing hearing.

Constitutionality of the Death Penalty

Finally, defendant raises several constitutional challenges to the death penalty. Defendant contends that the death penalty is unconstitutional because (1) the jury weighed the aggravating factor that the murder was committed in a “cold, calculated and premeditated manner,” which defendant asserts is unconstitutionally vague; (2) it is inevitable that the death penalty will be imposed on innocent persons; (3) death penalty procedure “places a burden of proof on the defendant which precludes meaningful consideration of mitigation” and allows the sentencing authority to weigh the purportedly vague aggravating factor of “any other reason”; and (4) numerous features of Illinois death penalty practice cumulatively render the statute unconstitutional for failure to sufficiently minimize the risk of arbitrarily or capriciously imposed death sentences. Defendant’s challenges have all previously been considered and rejected by this court. See 
People v. McLaurin
, 184 Ill. 2d 58, 99 (1998) (“cold, calculated, and premeditated manner” aggravating factor is not unconstitutionally vague) (and cases cited therein); 
People v. Bull
, 185 Ill. 2d 179, 211-20 (1998) (rejecting argument that death penalty is unconstitutional because it is “inevitab[le] that innocent persons will be wrongly convicted of capital crimes and executed”); 
People v. Jackson
, 182 Ill. 2d 30, 93-95 (1998) (Illinois death penalty statute not unconstitutional in placing burden on defendant to prove mitigating circumstances sufficient to preclude imposition of the death penalty); 
People v. Burgess
, 176 Ill. 2d 289, 322-23 (1997) (statutory requirement that the death sentence be imposed unless there exists mitigating evidence sufficient to preclude it does not prevent the sentencing authority from giving full effect to mitigating evidence introduced in a capital defendant’s behalf, and none of the features of death penalty practice of which defendant complains render the statute unconstitutional individually or in combination). We see no reason to revisit our earlier decisions, and accordingly reject defendant’s arguments.

CONCLUSION

For the reasons above stated, the judgment of the Circuit Court of Cook County is affirmed. We direct the clerk of this court to enter an order setting Tuesday, November 28, 2000, as the date on which the sentence of death, entered by the circuit court of Cook County, shall be carried out. Defendant shall be executed in the manner provided by law. 725 ILCS 5/119–5 (West 1996). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden of Tamms Correctional Center, and the warden of the institution where defendant is confined.

Affirmed
.

CHIEF JUSTICE HARRISON, concurring in part and dissenting in part:

I agree that Williams’ convictions should not be disturbed. In my view, however, his sentence of death cannot be allowed to stand. For the reasons set forth in my partial concurrence and partial dissent in
 People v. Bull
, 185 Ill. 2d 179 (1998)
, the Illinois death penalty law violates the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) and article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, §2). Williams’ sentence of death should therefore be vacated and he should be sentenced to a term of imprisonment. 720 ILCS 5/9–1(j) (West 1992).

FOOTNOTES
1:     
1
We are discussing the issues out of the order in which they are presented in defendant’s brief to this court. However, we will discuss each of the issues raised in defendant’s brief.

2:     
2
 Moreland was also sentenced to a term of 30 years for aggravated criminal sexual assault, sentence to run consecutive to the sentence for murder and concurrent with the sentence for armed robbery. However, this conviction was overturned on appeal. 
People v. Moreland
, 292 Ill. App. 3d 616 (1997).

3:     
3
Defendant might object that in 
Kliner
 this court differentiated between defendant and his codefendant in terms of their character and background, not just their relative culpability, in upholding defendant’s death sentence against his proportionality challenge. See 
Kliner
, 185 Ill. 2d at 176-77. While we did also distinguish the two perpetrators on these grounds, we clearly stated that the differences in character and background merely constituted “an 
additional
 basis for the sentence disparity.” (Emphasis added.) 
Kliner
, 185 Ill. 2d at 177.

4:     
4
The State ultimately called only one such witness, Anderson.