THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANGEL HOOD, Defendant-Appellant.

First District (3rd Division)  No. 1—89—1265

Opinion filed May 6, 1992.

Barbara Kamm, of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and David Stabrawa, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CERDA delivered the opinion of the court:

Codefendants Angel Hood and Anthony Ortiz were tried simultaneously in severed jury trials by separate juries that were unable to reach a verdict in either case. Defendant Angel Hood was then tried separately in a jury trial that ended in a mistrial because a police officer stated that defendant had taken a polygraph examination. In a third trial, defendant was again tried separately by a jury and was found guilty of first degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1). He was sentenced to 62½ years' imprisonment. On appeal, defendant asserts that (1) he was not found guilty beyond a reasonable doubt because the testimony of a crucial State eyewitness was incredible; (2) he was denied due process and his right to a fair trial by the State's improper impeachment of the defense's eyewitness; (3) he was denied due process and his right to a fair trial because a State rebuttal witness, a former assistant State's Attorney, volunteered prejudicial testimony about the defense's eyewitness; (4) he was denied his right to a fair trial by the State's failure to timely disclose the identity of a rebuttal witness or the substance of statements about which he testified; (5) his right to a fair and impartial jury was violated because the trial court erred in not excusing a prospective juror for cause; and (6) he was denied due process and his right to a fair trial by the prosecutor's improper closing argument comments. We reverse.

Miguel Rodriguez was beaten and stabbed to death on February 1, 1987. At trial, three witnesses testified that they saw two men beat and stab the victim. Earl Ward and Chiquita Khalaf observed the incident from their apartments located above the sidewalk where the vic-

tim was killed. Walter Pappas observed the incident while he was standing nearby.

Earl Ward testified that his third-floor apartment faced Racine Avenue in Chicago. After going to bed in the early morning hours of February 1, 1987, Ward was lying awake when he heard someone scream for help. He got up, looked out his window, and saw three people on Racine Avenue. One of the people hit the victim twice in the face. When he fell down, the second person kicked him.

Ward stated that he is nearsighted and wears eyeglasses. He was not wearing his eyeglasses at the time he observed the incident. Even though his view of the fight was blurry and he could not make out features or faces, Ward testified, he was able to see colors and figures and to determine the sex of people. Ward stated that the person who hit the victim was wearing a light gray hood and dark clothing and the person who kicked the victim was wearing dark clothes and a stocking cap. Ward further testified that the two men ran across the street toward Leland Avenue, not through the gangway. Ward did not see anyone else on the street at that time.

Because Ward thought it was another drunken brawl, which was common, he went back to bed. Later, however, when the victim failed to move, Ward got dressed and went downstairs. The police were already at the scene.

Walter Pappas testified that he was friends with the victim and knew both defendant and Ortiz. In 1986, Pappas was placed on three years' probation for burglary and robbery. Since being placed on probation, Pappas had been arrested at least 12 times. Pappas said that he had no pending petitions for violation of probation and was not told by any assistant State's Attorney that the charges would be dropped if he testified. All the cases were dismissed for lack of evidence, Pappas stated.

On January 31, 1987, Pappas testified, he was drinking in an apartment in the Leland Hotel located at Wilson and Racine Avenues with various people, including the victim and defendant. Around 3 a.m. on February 1, 1987, Pappas stated, he was at the corner of Leland and Racine Avenues with Dean Emery. Pappas contended that he was not drunk at the time, but did have a "buzz." He did not know how much the victim had to drink because they were not together the entire time before the stabbing. When he heard someone saying "stop, stop," Pappas looked around the corner and saw two men beating and kicking the victim. At first, Pappas, who was six to eight car lengths away from the three men, did not recognize them.

When Pappas yelled "hey, what do y'all think y'all doing?" defendant turned around and looked at him. Pappas recognized him because he had known defendant for three to four years. Pappas testified that defendant was wearing dark clothes and a blue or gray hooded jacket. The victim was saying "stop, stop" and did not have anything in his hands. It appeared to Pappas as if defendant had a knife in his hand and that his arm was moving in a downward motion. Pappas recognized the second attacker as Anthony Ortiz, who was wearing dark clothes. When the attackers ran, Pappas testified, he did not see where they ran because he was running home to his nearby apartment.

On cross-examination, Pappas admitted that he had previously testified that the attackers went through a gangway to a street west of Racine Avenue. Even though he did not see where the attackers ran, Pappas explained, he assumed they ran west because they did not come toward him.

When Pappas arrived at home, he did not call the police because the telephone was in his mother's bedroom and he did not want to disturb her. When the police arrived 15 or 20 minutes later, Pappas returned to the scene. He told the police he knew the victim, but did not see what happened.

The next day, Pappas slept until noon and then went to the Leland Hotel, where he drank with friends the entire afternoon. Later that day, the police approached him and asked if he would go to the police station to answer questions. Pappas stated that he was very drunk at the time.

At the police station, Pappas was placed in an interrogation room and handcuffed to the wall. When the police officers repeatedly asked if he knew about the killing, Pappas replied that he did not. Finally, the police let him sleep and get sober. While at the police station, Pappas was allowed to use the restroom by himself. He was never told he was a suspect nor did the officers threaten him regarding his probation. When he became sober, Pappas told the police he saw defendant and Ortiz beat and stab the victim in the back.

Pappas testified that he did not call the police because he was scared of defendant and his friends. He also stated that he told Dean Emery's sister, Karen, that he knew nothing about the stabbing because her sister had dated defendant.

Brian Via testified that he was acquainted with defendant. About 10 p.m. on January 31, 1987, Ortiz and Via went to defendant's apartment. The three men then drove around until Ortiz's car got a flat tire. While they were driving, Via said he noticed defendant opening

and closing a black and silver knife with "Kung fu" written on it. When Ortiz asked defendant for the knife, defendant dropped it on the front seat. Via identified People's exhibit 11 as looking like the knife he saw in the car. When they abandoned the car, Via testified, Ortiz took the knife with him.

Via admitted that he had earlier told the police that Ortiz, not defendant, had had the knife. Furthermore, Via stated, he had never before mentioned that defendant had been flicking the knife because the police never asked. He had told the police that Ortiz went back to the car and took the knife from the back seat. He also testified that, at the first trial, he did not say anything about defendant playing with the knife or the knife having "Kung fu" on it. At the second trial, however, he testified that defendant was flicking a knife that had "Kung fu" written on it.

According to Via, defendant was wearing black baggy pants and a waist-length black jacket over an inner gray jacket with a gray hood. Ortiz was wearing a long black trench coat, black baggy pants, and a light-colored shirt.

Shortly after the three men abandoned the car, Via went home alone, arriving around 1:45 a.m. Defendant and Ortiz said that they were going to the Wooden Nickel bar, which was located within a block of the stabbing. At 5:30 or 6 a.m., the police came to Via's home. They asked if he would be willing to go to the police station, if he knew defendant and Ortiz, and that they were investigating a homicide, but did not say who was killed. Via said he already knew who had been killed. He then went to the police station where he was questioned about the previous night.

Officer Carl Kurth testified that he and his partner were the first police officers to arrive at the scene. The victim's clothes were soaked with blood. After speaking with Earl Ward, they told the dispatcher they were looking for two white Latino men, who were wearing dark pants and dark jackets, possibly three-quarter length with a hood.

While waiting for a paddy wagon to arrive, Kurth testified, defendant and Ortiz, who both had black hair, walked from the south. Both men were wearing dark clothing and dark trench coats. Defendant had a light blue hood underneath his coat. Kurth did not notice anything unusual about their appearance. Both men identified themselves to the police. Defendant said that he thought the victim was a cousin of a friend. Defendant then went with a police officer to contact his friend and returned with the victim's father. Officer Kurth stated that Pappas did not identify the victim.

Officer Paul Carroll searched defendant's home on February 2, 1987, pursuant to a consent to search form signed by Ortiz, who had been staying at defendant's apartment. Officer Carroll recovered a knife (People's exhibit 11) from inside a woman's shoe in a bedroom closet. Pamela Fish, a Chicago police criminalist, testified that she tested the knife and found traces of blood on the blade. She was unable, however, to determine whether the blood, which was not visible with a microscope, was human or animal.

Deputy Medical Examiner Dr. Nancy Jones testified that the victim had twice the legal limit of alcohol in his blood at the time of his death. In that condition, Dr. Jones stated, the victim would have had difficulty defending himself. There were a number of bruises, abrasions, and small lacerations on the victim's face and arm, a broken arm, and eight stab wounds on his neck, shoulder, back, thigh, and arm. The victim had bled profusely. Dr. Jones testified that the knife recovered from defendant's apartment could have caused the broken arm and stab wounds. In Dr. Jones' opinion, the cause of death was the multiple stab wounds to the victim's back.

Chiquita Khalaf, a day-care center teacher's aide, testified that she lived in the same apartment building as Ward. Her apartment also faces Racine Avenue. About 3 a.m. on February 1, 1987, Khalaf was awakened by someone yelling for help. She looked out her window and saw two men hitting the victim. Khalaf stated that one attacker had brown hair and the other had blond hair. She testified that neither defendant nor Ortiz was one of the attackers.

After Khalaf heard someone to her left yell "hey," she ducked as the attackers looked in her direction. Although she briefly saw the attackers' faces, Khalaf stated, she could not identify them, except that they were white men. She then ran to her daughter's bedroom and back to the dining room, where she again looked out and saw one man running across the street, down Racine Avenue to Leland Avenue and then east on Leland Avenue, and the other running straight down Racine Avenue. Khalaf testified that neither man wore a hat or a hood.

On cross-examination, Khalaf stated that she did not know what the attackers wore and that they did not have beards or mustaches. She admitted that in a prior trial, she had testified that she did not see their faces. Khalaf denied telling an assistant State's Attorney that she saw nothing, that she was afraid, and that she knew defendant's family.

Khalaf stated that she was not acquainted with either defendant or Ortiz. When she was subpoenaed to testify at the first trial in De-

cember 1987, Khalaf called the assistant State's Attorney, who asked her if she knew defendant or his family. Khalaf told the assistant State's Attorney that she did not know them. Khalaf was subpoenaed by both defendant and the State, but the assistant State's Attorney told her not to come to court.

Khalaf also stated that she had told the police that she saw the beating. Although she did not say anything at first because she did not want to get involved, Khalaf testified, she later told the police that she saw the beating and one of the attackers had blond hair.

In the State's rebuttal case, former Assistant State's Attorney James Kogut testified that he had prosecuted defendant in December 1987. He stated that Khalaf telephoned him on December 3, 1987, and told him that she had not seen the incident, was afraid for herself and her family, knew defendant's family well, and had gotten word of threats against her family. Because of her fears, Kogut stated, he told her she would not have to testify. During that telephone conversation, Kogut testified, Assistant State's Attorney Peter Troy was listening to the conversation on another phone.

The next day, Kogut spoke with Khalaf in the jury room in the presence of Troy. At that time, Kogut asked Khalaf if she had told him that she knew defendant's family and that she did not want to testify because she was afraid of the people on the street and defendant's family. Khalaf denied telling Kogut those things. She stated that she told Kogut that she knew Angel, but not Angel Hood. Kogut testified that Khalaf again stated that she did not see the incident.

The prosecutor then asked Kogut if Khalaf ever told him she saw someone with blond hair. Kogut replied that Khalaf had admitted that "she told the police that Angel Hood was the person who was participating in the murder." The defense counsel objected and a sidebar was held during which defense counsel argued that no police reports indicated Khalaf told police that defendant was involved, that this testimony was highly prejudicial, and no foundation was laid for Khalaf's impeachment. The prosecutor withdrew the question and the jury was admonished by the court to disregard the testimony.

Marc Kaplan, executive director of the Uptown People's Law Center, testified that he knew Pappas and his family for 15 years. The Law Center had previously represented Mrs. Pappas on a disability claim. Based on discussions with people in the community and members of the Pappas family, Kaplan stated, Pappas' reputation was that he was not an honest person. Pappas had a severe problem with drinking, drugs, and inhaling tolly, a varnish remover. His reputation was that he spent most of his time intoxicated or trying to get money

to get high. Kaplan stated that based on Pappas' reputation in the community, he would not believe him under oath.

On cross-examination, Kaplan admitted that he knew members of the defense team and that they sometimes used his facilities. He was not, however, affiliated with any of defendant's attorneys.

Following closing arguments and jury instructions, the jury found defendant guilty of first degree murder. At the sentencing hearing, defendant was sentenced to 62½ years' imprisonment because the offense was brutal and heinous. The trial court also imposed a consecutive sentence of 27 days for violation of probation.

■ On appeal, defendant asserts that he was not proven guilty beyond a reasonable doubt because his conviction rested primarily on Pappas' testimony identifying him as one of the killers. Defendant contends that Pappas' testimony was incredible, unreliable, and contradicted because he had a reputation for lying, was highly intoxicated at the time of the incident, did not report the incident to the police, only implicated defendant after he was in the police station for questioning, and had a strong motive to falsify his testimony. The other State evidence was circumstantial and conflicted with the conclusion that defendant was one of the attackers, defendant claims. Furthermore, defendant indicates, he presented eyewitness testimony that he was not one of the attackers.

When presented with a challenge to the sufficiency of the evidence, it is the reviewing court's function to carefully examine the evidence, giving due consideration to the fact that the court and the jury saw and heard the witnesses. (*People v. Young* (1989), 128 Ill. 2d 1, 48.) A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261.) Viewing the evidence in the light most favorable to the prosecution, if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, the conviction will not be overturned. *Collins*, 106 Ill. 2d at 261.

Credibility of the witnesses and the weight given their testimony are exclusively within the province of the jury. (*People v. Mullen* (1990), 141 Ill. 2d 394, 403.) Any conflicts in the testimony are to be resolved by the jury. (*Collins*, 106 Ill. 2d at 261-62.) When resolution of guilt turns on the credibility of the witnesses, as it does in this case, the jury is to determine that credibility since it has a superior opportunity to observe their manner and demeanor. *People v. Graham* (1970), 127 Ill. App. 2d 272, 277.

There was sufficient evidence to affirm the conviction. The outcome of the trial depended on the credibility of the witnesses. The jury had an opportunity to view the witnesses and determine their credibility and the weight to be given to that testimony. The evidence was not so improbable or unsatisfactory that it created a reasonable doubt as to defendant's guilt.

Next, defendant asserts that the State's impeachment by omission of Chiquita Khalaf was improper because it was based on false insinuations that the State could not substantiate. The challenged remarks occurred during the State's cross-examination of Khalaf, when the prosecutor elicited testimony through questions that suggested that Khalaf did not tell police that she observed the incident or that one of the offenders had blond hair.

Khalaf testified that she told the police that she saw the beating. Although she did not initially say anything to the police because she did not want to get involved, Khalaf stated, she later told them that she saw the beating and one of the attackers had blond hair.

The State attempted to impeach Khalaf by using the police report. On cross-examination, the State asked if the police report stated that Khalaf had described one of the offenders as having blond hair. Defendant correctly contends that use of the police report to impeach Khalaf was improper. A witness cannot be impeached by a statement that is not in her own words or substantially verbatim. (*People v. Matthews* (1972), 7 Ill. App. 3d 1059, 1063.) Therefore, the prosecution must show that the police report was a substantially verbatim account of a witness' testimony. (*Matthews*, 7 Ill. App. 3d at 1063.) There was no such showing in this case.

Defendant then asserts that it is improper for the prosecutor to ask a witness questions for purposes of impeachment unless the prosecutor is prepared to offer proof of the impeaching information. (*People v. Olinger* (1986), 112 Ill. 2d 324, 341.) Defendant argues that there could be no perfection of the impeachment because two police officers testified in the first trial that Khalaf had told them that one of the offenders had blond hair.

Defendant cites *People v. O'Banner* (1991), 215 Ill. App. 3d 778, where the State questioned the defendant's sister about a possible extramarital affair by the defendant. After the witness denied any knowledge of such an affair, the State did not introduce any evidence on rebuttal to support its inferences. (*O'Banner*, 215 Ill. App. 3d at 794.) During closing argument, however, the State referred to the testimony and argued that the witness had lied to protect the defendant.

The court stated that the argument was an improper attempt to challenge the witness' credibility. *O'Banner*, 215 Ill. App. 3d at 794.

In his reply brief, defendant relies on *People v. Robinson* (1989), 189 Ill. App. 3d 323, 336, where the court ruled that it was reversible error for the prosecutor to insinuate, without any proof, that the witness told the police that during the attack she recognized the assailant's voice as the defendant's. At trial, the witness testified that she did not recognize the assailant's voice. (*Robinson*, 189 Ill. App. 3d at 336-37.) The prosecutor had no evidence that the witness ever made a statement inconsistent with her trial testimony. (*Robinson*, 189 Ill. App. 3d at 338.) Therefore, the court stated, the prosecutor's tactics, failure, and inability to perfect impeachment of the favorable defense testimony, and closing argument to the jury converting the improper insinuations and innuendos to proof were intolerable. *Robinson*, 189 Ill. App. 3d at 339.

The State responds that the trial court did not abuse its discretion because the impeachment was perfected when Khalaf testified that she did not initially tell the police anything because she did not want to get involved. The State then asserts that even if the impeachment was improper, it was either harmless error or cured by the trial court's instruction at the end of the trial.

The State relies on *People v. Rader* (1988), 178 Ill. App. 3d 453, for the proposition that there is no error for failure to perfect an impeachment if the trial court instructs the jury that the witness' prior inconsistent statement cannot be given substantive weight, but must only be used to assess the witness' credibility. In *Rader*, the court held that prior inconsistent statements that bear directly on the defendant's guilt are admissible as long as the jury is instructed at the time of impeachment and at the close of the trial that the statement cannot be given substantive weight. (178 Ill. App. 3d at 463.) The trial court in *Rader* twice instructed the jury at the time of impeachment and again at the close of all the evidence. 178 Ill. App. 3d at 463-64.

Error occurs when the State, on cross-examination, asks a defense witness questions, presuming facts not in evidence, as a precursor to impeachment of that witness, in the absence of rebuttal evidence to substantiate the inquiry. (*O'Banner*, 215 Ill. App. 3d at 794.) The danger inherent in such questioning is that the jury will ignore the denial, presume the accuracy of the question's insinuation or innuendo, and substitute the presumption for proof. *O'Banner*, 215 Ill. App. 3d at 794.

■ The State failed to complete its impeachment of Khalaf regarding her not telling the police that she observed the incident or that one of the offenders had blond hair. The omission of those statements in the police report could not be used to impeach Khalaf because there was no showing that the report was a substantially verbatim account of Khalaf's testimony.

The only other evidence used to impeach Khalaf was former Assistant State's Attorney Kogut's testimony. Kogut never answered the question about one of the attackers having blond hair and he did not testify that Khalaf told him that she had told the police that she did not see the incident. Kogut testified that Khalaf told him that she did not see the incident and did not want to testify at trial.

The State's failure to follow through with the impeachment was prejudicial. Khalaf's testimony was crucial eyewitness testimony and the unfounded insinuations were substantial. Moreover, the evidence against defendant was not overwhelming. The trial court's instruction was not sufficient.

Next, defendant argues that he was denied a fair trial because the State's rebuttal witness, James Kogut, the former assistant State's Attorney who prosecuted defendant in the first trial, deliberately volunteered testimony that Khalaf, the defense eyewitness, stated that she told the police defendant participated in the murder. Defendant contends that Kogut's unresponsive testimony, which was improper and deliberately made, was used in the State's closing argument to argue that Khalaf was testifying on defendant's behalf out of fear even though she had seen him commit the murder. Defendant indicates that the police reports do not state that Khalaf told them defendant was one of the attackers. Because this rebuttal testimony was very damaging to Khalaf's credibility, defendant concludes, the prosecutor's misconduct in presenting and relying on this evidence was prejudicial, denying him a fair trial.

Defendant asserts that the State's questioning of Kogut about whether Khalaf told him that one of the attackers had blond hair was improper because no foundation was laid during the State's cross-examination of Khalaf. During that cross-examination, Khalaf denied telling the assistant State's Attorney that she saw nothing, that she was afraid, and that she knew defendant's family.

In order to impeach a witness with a prior inconsistent statement, the witness' attention must be directed to the time, place, circumstances, and the substance of the prior inconsistent statement in order to give the witness an opportunity to explain. (*People*

*v. Cobb* (1983), 97 Ill. 2d 465, 479.) Since no questioning regarding blond hair occurred, no foundation was laid to impeach Khalaf on any alleged statement to Kogut about the color of the attackers' hair. Thus, the State's question to Kogut was improper.

In response to the improper question, Kogut gratuitously offered that Khalaf admitted to him that she had implicated defendant to the police. Although the trial court struck the testimony and admonished the jury not to consider it, defendant claims that its prejudicial impact could not be erased from the jurors' minds. Furthermore, defendant contends, the manner in which this testimony was presented demonstrates that it was deliberate.

While a trial court's prompt action in sustaining an objection and instructing the jury to disregard the improper testimony may cure potential prejudice (*People v. Brooks* (1988), 172 Ill. App. 3d 417, 422), reversible error can occur despite the sustaining of the objection. (*People v. Fletcher* (1987), 156 Ill. App. 3d 405, 412; *People v. Brown* (1983), 113 Ill. App. 3d 625, 629.) It is the duty of the reviewing court to consider the trial record as a whole in determining whether a new trial is necessary because the guilty finding was the result of the error. *Brooks*, 172 Ill. App. 3d at 422.

■ Although the trial court promptly sustained the defense's objection and admonished the jury not to consider Kogut's statement, Kogut's gratuitous testimony was prejudicial. The State's responsibility is not alleviated because Kogut's answer was unresponsive. Kogut is a former assistant State's Attorney who had been the prosecutor in defendant's first two trials. The improper question and unresponsive answer were not accidental. They were deliberate tactics that were highly prejudicial. Khalaf's testimony was crucial to defendant. Kogut's gratuitous remark, of which there was no evidence, contradicted the essence of Khalaf's testimony.

That error was compounded because the State did not timely notify defendant that Kogut would be called as a rebuttal witness and did not tender the substance of the statements to which he would testify. Defendant argues that this discovery violation prejudiced him in the investigation and preparation of his defense. With prior notice, defendant indicates, he could have discredited the evidence and would have changed his strategy. Instead of calling Khalaf as a witness, he would have called Karen Emery, who testified at the first trial that Pappas told her that he did not see anything that night.

The State's argument that its intent to call Kogut arose only after Khalaf took the stand is meritless. The State asserts that

defendant did not suffer prejudice due to the timing of the rebuttal witness' disclosure because the defense counsel was not surprised. The State argues that he was put on notice when the State was laying the foundation during Khalaf's cross-examination, had the State's interview notes, did not ask for a continuance, did not request to interview Kogut, and was able to cross-examine Kogut about his bias toward Khalaf, the State argues. Furthermore, the State claims, the defense counsel had earlier stated that Khalaf may not testify and her testimony from the previous trial could be used.

The record shows that on January 24, 1989, the defense counsel informed the trial court that Khalaf had moved and they had trouble locating her. Before she moved, however, she had been personally served with a subpoena to testify. There is nothing in the record that the defense counsel indicated that she may not testify and that he would use her testimony from the first trial.

The trial started on January 24, 1989. At the beginning of the afternoon session on January 26, 1989, defendant's case in chief began. After Khalaf was sworn in, the defense counsel informed the trial court that the prosecutor told him of the possible cross-examination regarding Khalaf's alleged statements to Kogut and that Kogut would testify. The defense counsel objected to any statement being used because he had no knowledge of it. The prosecutor orally represented his perception of the substance of the alleged statements made before and during the first trial.

Later that afternoon, Khalaf testified. After her testimony, the prosecutor gave the defense attorney Kogut's notes. The next morning, Kogut testified in the State's rebuttal case.

The defense counsel had no prior knowledge, other than Kogut's notes tendered after Khalaf's testimony, that any statements had been made by Khalaf. During the first trial, there was an *in camera* hearing between Khalaf and the trial judge. After the hearing, the trial judge informed the attorneys that Khalaf said that the prosecutor was saying she told him things on the telephone that she did not say. The substance of that phone conversation, however, was not revealed. When Kogut cross-examined Khalaf during the first trial, she admitted telling him earlier that she could not identify the attackers because she did not see their faces. No other impeachment was attempted.

Supreme Court Rule 412 (107 Ill. 2d R. 412) creates an affirmative duty for the State to disclose rebuttal witnesses once the State has formed the intent to call the witnesses. (*People v. Washington*

(1989), 182 Ill. App. 3d 168, 174.) The purpose of the discovery rule is to provide the defense protection against surprise and unfairness, and to give defendant an opportunity to investigate the circumstances surrounding the making of a statement. *Washington*, 182 Ill. App. 3d at 174.

Supreme Court Rule 415(g) (73 Ill. 2d R. 415(g)) provides possible sanctions against a party that has failed to comply with an applicable discovery rule. The trial court may order disclosure of the information, grant a continuance, exclude the evidence, or enter such other order as it deems just under the circumstances. (*People v. Weaver* (1982), 92 Ill. 2d 545, 558.) The closer the evidence, the stronger is the case for excluding the statement or declaring a mistrial. The strength of the undisclosed evidence, the likelihood that prior notice could have helped the defense discredit the evidence, the feasibility of a continuance rather than a more drastic sanction, and the willfulness of the State in failing to disclose are factors which must be considered. (*Weaver*, 92 Ill. 2d at 560.) If the defendant is prejudiced by a discovery violation and the trial court fails to eliminate that prejudice, there is an abuse of discretion. *People v. Harris* (1988), 123 Ill. 2d 113, 151-52.

The record indicates that the State formed the intent to call Kogut in its rebuttal case before Khalaf testified. Khalaf had testified in the first trial and was scheduled to testify in the second trial before the mistrial occurred. The State was aware of her testimony and aware of Kogut's potential testimony. Therefore, it seems improbable that the State did not form the intent to call Kogut as a rebuttal witness until after Khalaf testified. Before the defense witnesses testified, the State notified the defense counsel that Kogut may be called to testify to impeach Khalaf. Yet, the State did not tender Kogut's notes regarding his prior conversations with Khalaf until after Khalaf testified, the evening before Kogut's testimony.

Kogut's testimony was very damaging to defendant. Khalaf was a crucial eyewitness who contradicted the State's eyewitness testimony. Moreover, the evidence against defendant was not overwhelming. The untimely disclosure of the witness and the nondisclosure of the alleged statement prevented the defense counsel from properly investigating the matter. Because the nature of the undisclosed evidence was damaging and the State willfully failed to disclose it, fundamental fairness requires that defendant be entitled to a new trial.

■ There is no merit to defendant's assertion that his sixth and fourteenth amendment rights to a fair and impartial jury were

violated because the trial court did not excuse Jay Widgren, a prospective juror, for cause due to his being a party in a pending lawsuit. There is nothing in the record to indicate that Widgren was challenged for cause. The actual selection of the jury occurred in the judge's chambers outside the presence of the court reporter. It was never put on the record. Defendant's memorandum in support of the post-trial motion and the defense counsel's oral argument on that motion are not sufficient. The record indicated that Widgren's wife, not Widgren, had a pending lawsuit related to an automobile accident. There was also no merit to defendant's contention that Widgren was not fair and impartial.

■ Finally, defendant asserts that he was denied a fair trial by the cumulative effect of the prosecutor's improper closing argument comments vouching for the credibility of the State's witnesses, misstating the evidence, and making remarks not based on the record. Most of these issues were either waived or were not improper. The prosecutor's remarks regarding the alleged fear instilled by defendant in Khalaf, however, were improper.

Those improper remarks included:

> "I submit to you, knock on any door in uptown [sic], you will find people like Chaka Kalliff [sic] who are too afraid to come in here and be involved, and you will find people throughout uptown [sic] who have good reason not to be involved. And that is exactly what happened with Ms. Kalliff [sic].
>
> * * *
>
> She is doing what she thought she had to do to protect her family, herself and her family. There is nothing wrong with that. That is why Mr. Kogut told her, you don't have to come down if you are that afraid. We are not going to compel you to testify. [Khalaf] like Walter Pappas is afraid. She is afraid to testify against this guy and she told that to Mr. Kogut, as in the case of Walter Pappas. I submit to you she has good reason to be afraid, ladies and gentlemen. She is not an evil woman and she is not an immoral woman, and she is not a bad woman. She is just a woman like too many other people in uptown [sic], is afraid and doesn't want to get involved.
>
> * * *
>
> [Khalaf] is a woman who is afraid ***. Her family still lives in that area. Her family still lives in that area. Her daughter and her grandchildren, and there isn't a person here that wouldn't think about their family, your own family. You would

say I don't want nothing [*sic*] to happen to them, but what is the price that I have to pay."

Although evidence of a defendant's intimidation of a witness is admissible because it is probative of consciousness of guilt, it is admissible only if there is actual evidence that the defendant made those threats. (*People v. Frazier* (1982), 107 Ill. App. 3d 1096, 1100.) Prosecutorial comments that suggest that a witness was afraid to testify because defendant had threatened or intimidated her, when not based on any evidence in the record, are highly prejudicial and inflammatory. (*People v. Mullen* (1990), 141 Ill. 2d 394, 405.) It is improper for the prosecutor to do or say anything in closing argument when the only effect will be to inflame the passion or arouse the prejudice of the jury against the defendant. *People v. Smith* (1990), 141 Ill. 2d 40, 60.

To be proper, closing argument comments on evidence must be either proved by direct evidence or be a fair and reasonable inference from the facts and circumstances proven. (*Mullen,* 141 Ill. 2d at 404.) There was no evidence of threats made by defendant or anyone else against Khalaf. The only testimony presented of any such threats was Kogut's testimony, which was impeachment evidence, not substantive evidence. Improper use during closing argument of evidence that was introduced for a limited purpose can be reversible error. (*People v. Fields* (1988), 170 Ill. App. 3d 1, 15.) Since the improper remarks resulted in substantial prejudice to defendant, they are reversible error. The trial court's instruction, that arguments by the prosecutors were not evidence and should not be considered by the jury during their deliberations, was not sufficient to cure the prejudicial impact of the State's improper comments.

Based on the foregoing, defendant's conviction is reversed and remanded for a new trial.

Reversed and remanded.

RIZZI and TULLY, JJ., concur.