2020 IL App (2d) 180899-U
No. 2-18-0899
Order filed December 7, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Winnebago County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 18-CF-586 |
| | ) | |
| JOSEPH DEAN MORSON, | ) | Honorable |
| | ) | Robert R. Wilt, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HUDSON delivered the judgment of the court.
Justices Schostok and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Variance between date alleged in indictment and date proven by evidence was not fatal; trial court did not err in instructing the jury that the State was not required to prove the date on which the offense occurred; limiting instruction and not mistrial was adequate remedy when State's witness twice testified to objectional material; and trial court conducted adequate inquiry in accordance with *People v. Krankel*, 102 Ill. 2d 181, 189 (1984).

¶ 2                                    I. INTRODUCTION

¶ 3    Following a jury trial in the circuit court of Winnebago County, defendant, Joseph Dean Morson, was convicted of two counts of aggravated domestic battery and one count of unlawful restraint. He now appeals, raising four issues. First, he contends that the State failed to prove him guilty in that there was a variance between the essential elements of the crime charged in the

indictment and the evidence adduced by the State at trial. Essentially, he argues that the State alleged an element of the offense of unlawful restraint occurred on one date and offered evidence that the offense took place on a different date. Second, he asserts that the trial court erred in instructing the jury with respect to this variance. Third, he alleges error in the trial court's failure to declare a mistrial after one of the State's witnesses testified in a manner defendant contends was unfairly prejudicial to him after she was admonished not to do so. Fourth, he asserts that the trial court did not conduct a proper *Krankel* hearing after he raised the issue of his trial attorney's alleged ineffectiveness. We find none of these arguments well taken; therefore, we affirm.

¶ 4                                     II. BACKGROUND

¶ 5      Defendant was charged by indictment with two counts of aggravated domestic battery and one count of unlawful restraint. Pertinent here, regarding unlawful restraint (the third count), the State alleged, "[O]n the 12th day of March, 2018, *** defendant knowingly and without legal authority detained Rebecca Shank in that the defendant threatened to kill Rebecca Shank if she left the apartment."

¶ 6      An initial trial ended in a mistrial. Following the earlier trial, defendant asked for a new attorney, alleging that his attorney had "hardly ever visited [him] whatsoever." The trial court asked defendant's attorney to address this claim. She stated that while she had intended to see defendant during the previous week, she was in trial and her colleague, who was also working on the case, had visited defendant. She acknowledged that she had more to do to prepare, but stated that she intended to do so before the trial. The trial court noted that the earlier mistrial was not based on defense counsel's lack of preparation. The trial court denied defendant's request, explaining that it would not order new representation. The trial court told defendant that he was entitled to represent himself, but advised against it.

¶ 7    At trial, the State first called Rebecca Shank, the victim. In the spring of 2018, she was employed as a licensed practical nurse at a rehabilitation center. She worked from 6 p.m. to 6 a.m. She was living in an apartment with defendant. They had been in a dating relationship for two years and nine months at the time of the incident at issue in this case.

¶ 8    The victim testified that on March 8, 2018, defendant wanted her to watch a video on his cell phone. She testified that she accidentally caused the phone to scroll down to the comments section, and defendant accused the victim of being nosey. The victim testified that she handed the phone to defendant, who then struck the victim with an open hand on the side of the head. Defendant struck her about three or four times. The victim was crying, and defendant stated that he had not hurt her. The victim went to the bathroom and observed bruises forming. Defendant had followed the victim to the bathroom. He stated that she would not be able to go to work the next day, and he accused her of having affairs with coworkers. They returned to the front room. Defendant continued to strike the victim. Defendant went through the victim's cell phone, and, after finding a text, hit her again. About two or three hours had elapsed since the initial incident with the video.

¶ 9    Defendant told the victim she could get ready for bed and take her medicine. She took a can of soda out of the refrigerator and took a pill. Defendant became angry because the soda was the last one of a variety he liked, so he started hitting the victim again. Defendant directed the victim to return to the front room, where he continued to beat her. After a couple of hours, defendant allowed her to go to bed. He slept next to her. The victim did not try to leave because defendant is a light sleeper and she was afraid he would wake up.

¶ 10    The victim testified that the next morning she awoke about 11 a.m. Defendant was in the front room, watching television. She was supposed to work that evening. Defendant told the

victim she could not go to work because she had bruises all over her face. She looked in a mirror and noted that there were bruises on both sides of her forehead and that she was starting to get a black eye. Defendant made the victim text her employer and say that she was not going in to work that day. After she sent the text, defendant took her cell phone from her. It was around 2 p.m. Defendant then started hitting the victim again. Defendant accused the victim of killing her mother, who had died over four years earlier. Defendant stated that the victim was a "big disappointment," and he threatened her children and grandchildren. The victim testified that defendant stated that he had "connections."

¶ 11   At this point, defense counsel interposed an objection. Outside the presence of the jury, defense counsel asserted that this testimony was unduly prejudicial in that the indictment did not allege a threat directed against the victim's children or grandchildren. The trial court noted that the indictment on count III specifically alleged a threat to kill the victim. The trial court instructed the State to admonish the victim not to testify further about any threats directed to anyone but her. The State agreed to admonish the victim "not to go further [than] what has been asked of her already." The trial court sustained defendant's objection. It instructed the jury to disregard the victim's last answer.

¶ 12   The victim testified that defendant continued to strike her throughout the afternoon. She estimated he struck her five or six times. In the evening, defendant told the victim she could go to bed. He followed her into the bedroom, turned on the light, and started screaming at her. Defendant instructed the victim to get on the floor like a dog, and she complied. She was on her side, and defendant started to kick her. Defendant then made the victim lie on the floor in the front room, and he continued to kick her. Defendant kicked her about 10 to 15 times. Defendant ordered the victim to sit in a chair and told her she would not be sleeping that night. While the victim was

sitting in the chair, defendant leaned over her and choked her. Defendant stopped choking her and hit her in the face, breaking her nose. Her nose gushed blood. Defendant got the victim a washcloth, and she used it to stop the bleeding. After the bleeding stopped, defendant told the victim she could lay down for a while.

¶ 13    The victim got up a few hours later, which was the next day. She noted that dishes needed to be washed, so she started doing them. She then returned to the front room and sat down. Defendant started hitting her in the leg. Defendant threatened to break her knees. Defendant told her that she had to quit her job. Defendant then stomped on the victim's feet. Defendant also threw oranges at the victim. Defendant then made the victim call her employer and say that she would not be coming in for the rest of the weekend. The victim laid down on the couch. Defendant continued to strike her. Eventually, she told defendant she was tired, and he told her to go to bed.

¶ 14    Early the next morning at about 12:30 a.m., the victim got up to go to the bathroom. She noted defendant was sleeping, and she left the apartment. She drove herself to her place of employment. Her coworkers saw her and called the police. She was taken to a hospital, where a medical examination was performed. The examination revealed three facial fractures. Also, her "whole body was bruised."

¶ 15    The State asked the victim why she did not leave the apartment earlier. She stated that defendant "was guarding [her]." When asked if defendant threatened her, the victim replied, "No." The State then asked if defendant ever told her what would happen if she tried to leave. The victim answered, "He told me that if I left he would make sure my family was hurt." Defense counsel objected, and the trial court sustained the objection. The jury was removed from the courtroom. The trial court asked the victim if the State had told her she could not mention any threats other than ones directed to her. The victim stated that it had done so. Defendant moved for a mistrial.

The trial court found that the victim had purposely violated its earlier ruling that such testimony was inadmissible. The trial court denied defendant's request for a mistrial, finding that a limiting instruction telling the jury to disregard this testimony was the appropriate remedy. The trial court admonished the victim to refrain from mentioning threats to anyone besides her. When the jury returned, the victim testified that despite her earlier testimony that defendant did not threaten her, he, in fact, did so on one occasion, stating that he would kill her if she tried to leave.

¶ 16    On cross-examination, the victim testified that the one time that defendant threatened her occurred on March 8, 2018. Outside of the times he allowed the victim to call work, defendant kept control of the victim's cell phone. She acknowledged that she did not mention this in her statement to the police. The victim stated that she tried yelling out of a window for help, but defendant told her to "shut up." When she finally escaped, she went to her place of employment because she knew it was safe. The victim explained that she was not from Rockford and was not sure where a police station was located.

¶ 17    Officer Kurt Swanson of the Rockford Police Department next testified for the State. On March 12, 2018, at approximately 2 a.m., he was dispatched to a local rehabilitation center. There, he encountered the victim, who was sitting in the lobby. Her face was bruised. The victim was sobbing and was having a hard time explaining what had happened. The victim was transported to a hospital. Swanson photographed the bruises. On cross-examination, Swanson stated that he had not taken any photographs of defendant. He did not believe any other officer had photographed defendant.

¶ 18    The State next called Tim Charlton, a patrol officer with the Rockford Police Department. He was dispatched to the apartment where defendant and the victim lived on March 12, 2018. Other officers were present. They were attempting to locate defendant. They were successful and

placed defendant under arrest. Defendant was placed in a squad car. The officers then entered the apartment. Charlton noted that the sheets had been stripped off the bed and that there "were several dark colored stains on the carpet." The coloration of the carpet around the stains was lighter than the carpet in the rest of the room. Moreover, "[t]he room smelled strongly of bleach." He also saw a small garbage can with a tissue in it. The tissue had a dark red stain on it. Two fans were blowing toward the stains. Charlton went to the living room He observed similar stains on the carpet and noted the smell of bleach. There was a bottle of bleach on the dining room table. He took photographs to document what he saw in the apartment. On cross-examination, Charlton testified that they tried to take pictures of defendant's hands; however, defendant would not cooperate and kept moving them. Charlton acknowledged that he did not know who put the stains on the carpet or how long they were there.

¶ 19    The State's next witness was Angela Giardano, a nurse practitioner. She was working in the emergency department on March 12, 2018, when the victim arrived there. The victim told Giardano that "she had been beaten and hit multiple times." Giardano performed an examination. The examination included an X ray of the victim's foot and a CT scan of her head. The CT scan showed "a right orbital blowout fracture," "bilateral nasal bone fractures and a right maxillary fracture."

¶ 20    Following Giardano's testimony, the State rested. Defendant then testified in his own behalf. In March 2018, he was living in an apartment with his girlfriend, the victim. They had been in a relationship for two years and nine months. On March 8, 2018, defendant got up at about 5:30 a.m. or 6 a.m. The victim was present. Defendant was not employed at the time. Defendant stated that he and the victim never had a conversation concerning watching a video on his cell phone. However, they did discuss their relationship that day. Defendant told the victim he was

"frustrated with the relationship" and that he wanted "to get back to work." Defendant had previously worked as a truck driver. He was not working because he was on medical leave for a thyroid problem. Defendant wanted to move back to Terre Haute, Indiana, and begin the process of becoming a truck driver again.

¶ 21 Defendant testified that the victim did not work on March 8, 2018, because it was a scheduled day off for her. Defendant denied arguing with the victim, and he testified that he did not prevent her from leaving the apartment. Defendant stated that the victim did not want him to move back to Indiana. He denied ever strangling her or striking her. On March 9, 2018, the victim called in to work. On the ninth and the tenth, defendant and the victim primarily watched television and discussed his desire to return to Indiana. Defendant testified that at no point did he strangle the victim, hit her, or prevent her from leaving. Further, defendant never threatened the victim in any manner. Defendant stated that he did not know whether the victim left the apartment at any time between March 8 and March 12, 2018.

¶ 22 On cross-examination, defendant stated that he had not worked as a truck driver since 2015. The apartment he shared with the victim was small and "it is pretty easy to hear from one end to [the] other." Defendant did not leave the apartment between March 8 and March 12, 2018.

¶ 23 Defendant then rested, and the State did not call any rebuttal witnesses. Defendant moved for a directed verdict, and the trial court denied the motion. The jury found defendant guilty of all three charged counts. This appeal followed.

¶ 24                                    III. ANALYSIS

¶ 25 On appeal, defendant first argues that the State failed to prove him guilty because there was a variance between the date alleged in the indictment regarding the unlawful restraint charge and the date on which the evidence showed an element of the offense occurred. Second, defendant

contends that the trial court erred in instructing the jury with respect to this variance. Third, he argues that the trial court should have declared a mistrial after the victim persisted in testifying to prejudicial allegations after being admonished not to. Fourth, he contends that the trial court did not conduct an adequate *Krankel* hearing after he complained of the representation he was receiving from his trial attorney. We will address these arguments in turn.

¶ 26                                A. FATAL VARIANCE

¶ 27    Defendant first argues that the State failed to prove every element of the charged offense without variance. At issue here, count III alleged as follows: "[O]n the 12th day of March, 2018, *** defendant knowingly and without legal authority detained Rebecca Shank in that the defendant threatened to kill Rebecca Shank if she left the apartment." At trial, the victim testified that defendant threatened her on March 8, 2018. Accordingly, defendant concludes, he was not proven guilty beyond a reasonable doubt. Defendant does not dispute the underlying facts; rather, he argues that the facts proven by the State are insufficient to sustain his conviction. Accordingly, review is *de novo*. *People v. McGee*, 326 Ill. App. 3d 165, 168 (2001).

¶ 28    Of course, the general rule is that the date on which a crime occurred is not an essential element of an offense. See *People v. Alexander*, 93 Ill. 2d 73, 77 (1982) ("The date alleged in a charging instrument need not ordinarily be proved precisely. If there is an error in the indictment, and upon trial the proof establishes that the offense was committed on a date other than the precise date alleged, that irregularity will not constitute a fatal variance."). Indeed, in *People v. Sui Wing Eng*, 138 Ill. App. 3d 281, 287 (1985), the First District of this appellate court specifically held, "With respect to the crimes of robbery, *unlawful restraint*, and intimidation charged against [the defendant], the date of the crime is not an essential element of the charge." (Emphasis added.)

¶ 29    However, defendant attempts to elevate the date to the status of an essential element, first noting that the unlawful restraint statute merely provides that a person commits the offense "when he or she knowingly without legal authority detains another."  720 ILCS 5/10-3(a) (West 2018). Defendant then asserts that when a statute "does not particularize the offense nor describe the acts which constitute the crime, the charge must then contain specific allegations of the acts constituting the offense in order to comply with due process."  In support, he cites *People v. Stoudt*, 198 Ill. App. 3d 124, 128 (1990) (citing *People v. Gerdes*, 173 Ill. App. 3d 1024, 1029 (1988)), which holds:

> " 'Where * * * the statute defining an offense specifies the type of conduct prohibited, the particular act at issue need not be alleged, and the information may simply set out the offense in the language of the statute.  Where, on the other hand, the statute defines the offense only in general terms, a charge couched in the language of the statute is insufficient.' "

Defendant also relies on *People v. Green*, 368 Ill. 242, 252-55 (1938) (holding that indictment for reckless driving was insufficient where it only alleged a willful and wanton disregard for the safety of other, which tracked the relevant statutory language, and that specific factual allegations were required.).  Defendant then reasons that since the unlawful restraint statute defines the crimes only in general terms, the factual allegations contained in the indictment are the essential elements of the offense.  Here, those allegations included the date the threat was allegedly communicated to the victim.  Thus, defendant concludes, in this case, the date was an essential element of the crime.

¶ 30    Of course, the State must prove every essential element of a charge without variance. *People v. Miller*, 253 Ill. App. 3d 1032, 1036 (1993).  The question before us, therefore, is whether

the date of the offense is an essential element of the crime under the circumstances of this case. Defendant fails to persuade us that it is.

¶ 31    As noted, a charging instrument must either track statutory language that particularizes the offense or, in the absence of such statutory language, "specifically allege all the facts which constitute the crime." *People v. Abrams*, 48 Ill. 2d 446, 459 (1971); see also *Miller*, 253 Ill. App. 3d at 1035 ("A complaint for a statutory offense must either set out the offense in the language of the statute or specifically set forth *the facts which constitute the crime* and must notify the accused with reasonable certainty of the precise offense charged." (Emphasis added.)  How the date on which the crime occurred is a "fact which constitutes the crime" is not apparent to us.

¶ 32    The mere inclusion of the date in the charging instrument simply does not elevate it to the status of an element of the offense.  It has long been the rule in this state that "[p]roof of the precise date as alleged is unnecessary unless the allegation of a special time is an essential ingredient of the crime or the running of the period of limitation" is at issue.  *People v. Taylor*, 391 Ill. 11, 14 (1945).  Moreover, "[a] slight variance from the date charged in the indictment is immaterial." *Id*. More recently, our supreme court held, "If there is an error in the indictment, and upon trial the proof establishes that the offense was committed on a date other than the precise date alleged, that irregularity will not constitute a fatal variance." *Alexander*, 93 Ill. 2d at 77.  Clearly, the date upon which it occurred is not generally an element of an offense.

¶ 33    Defendant contends that the instant case is different because the date was alleged in an indictment based on an offense of which the elements are not detailed in the statute defining it. However, where the elements of the offense are defined by statute, alleging the date in the indictment does not transform it into an element of the offense.  See *Alexander*, 93 Ill. 2d at 77. In a statutorily undefined offense, it simply does not follow from the fact that the State is required

to allege the particular facts constituting the crime that the inclusion of the date in the indictment transforms it into an element, contrary to the general rule that the date need not be proved without variance. Defendant offers no persuasive reason why the general rule would not apply in this context, and he cites no authority that would substantiate treating the date differently in these two contexts. In short, defendant has failed to persuade us that the date was an essential element of the offense in the present context.

¶ 34    We also note that defendant asserts that, had the State alleged that the threat had occurred on March 8, 2018, rather than March 12, 2018, "the defense might have made any number of different decisions as it pertained to trial strategy or even pre-trial negotiations." However, he does not identify what any of those decisions might have been or how this prejudiced him. Defendant notes that the unlawful restraint count alleged a specific date while the aggravated battery charges alleged the offenses occurred "on or about" a certain date, but he does not explain what he would have done differently had the unlawful restraint count contained such language. Similarly, defendant complains of a lack of notice, again without addressing prejudice. Where, as here, a defendant first challenges an indictment after trial is complete, the defendant must show that he or she was prejudiced in preparing a defense. *People v. Mims*, 2014 IL App (1st) 082747-B, ¶ 33.

¶ 35    Defendant further contends that because of the way a threat functions in the context of an unlawful restraint charge, the timing of the threat was critical. In its reply brief, the State suggested that the threat was made on March 8 and persisted through March 12 in that the victim continued to live in fear of the threat throughout this period. Defendant points out that a threat made at the end of a period of confinement would not explain why the threatened person would not feel free to leave earlier in the period. Initially, we note that, for the purposes of the offense of unlawful

restraint, "[i]f a party is actually restrained without legal authority, the duration of the restraint, however short, is inconsequential." *People v. Jones*, 93 Ill. App. 3d 475, 479 (1981). Thus, unless the threat was made at the literal end of the period of confinement, defendant's point would not be well taken. More importantly, defendant does not explain how he would have defended the charge differently had the State alleged the threat had occurred on March 8 rather than March 12.

¶ 36    To conclude, we reject defendant's argument on this point.

¶ 37                                B. JURY INSTRUCTION

¶ 38    Defendant next contends that the trial court should not have instructed the jury with the following instruction:

> "The indictment states that the offenses charged were committed on or about March 12, 2018. If you find the offenses charged were committed, the State is not required to prove that they were committed on the particular date charged." See Illinois Pattern Jury Instructions, Criminal, No. 3.01 (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 11.78).

A trial court's decision to give a particular jury instruction will not be reversed absent an abuse of discretion. *In re Timothy H.*, 301 Ill. App. 3d 1008, 1015 (1998). An abuse of discretion occurs only if no reasonable person could agree with the trial court. *People v. Appelt*, 2013 IL App (4th) 120394 ¶ 86.

¶ 39    Giving this instruction may constitute error if "(1) 'inconsistencies between the date charged in the indictment and the evidence presented at trial are so great that the defendant is misled in presenting his defense'; or (2) the defendant 'presents an alibi for the time alleged in the indictment and is thereby prejudiced because he failed to gather evidence and witnesses for the time actually proved by the State.' " *People v. Thrasher*, 383 Ill. App. 3d 363, 368 (2008). In this case, defendant did not present an alibi. Regarding the first criteria, defendant continues to

maintain that the difference between the date alleged as opposed to the date on which the evidence showed the threat was made was material. However, as explained in the preceding section, defendant does explain what he would have done differently if the State had alleged the threat was made on March 8, 2018, or how that resulted in prejudice to his defense. Accordingly, we find this argument similarly unpersuasive.

¶ 40                                C. MISTRIAL

¶ 41    Defendant next argues that the trial court erred in denying his motion for a mistrial after the victim twice testified to other bad acts he allegedly committed after being admonished not to. We review a ruling of a trial court concerning whether to grant a mistrial using the abuse-of-discretion standard. *People v. Staten*, 143 Ill. App. 3d 1039, 1056 (1986). Therefore, we will reverse only if no reasonable person could agree with the trial court's decision. *In re S.F.*, 2020 IL App (2d) 190248, ¶ 47.

¶ 42    The facts underlying this issue are, for the most part, not in dispute. In response to a question by the State as to what occurred after defendant told the victim she was a disappointment, the victim stated that defendant threatened her children and grandchildren. Defendant stated that he had "connections." Defense counsel interposed an objection, which the trial court sustained. Outside the presence of the jury, the trial court noted that the unlawful restraint indictment only mentioned threats by defendant directed to the victim. Thus, it reasoned, threats directed to others were not relevant. The State, as instructed by the trial court, then admonished the victim to limit her testimony accordingly, and the jury was brought back into the courtroom. The trial court then sustained the objection in the presence of the jury and directed the jurors to disregard this testimony.

¶ 43    Subsequently, the State asked whether defendant had threatened the victim, and she replied, "No." The State then asked, "Were you ever told by the defendant what would happen if you tried to leave?" The victim answered, "He told me that if I left that he would make sure my family was hurt." Defense counsel objected. The trial court immediately sustained the objection and had the jury removed from the courtroom. It then asked the victim whether the State had told her she could only testify about threats directed to her, and she stated that the State had done so. The trial court then excused the victim from the courtroom. The trial court asked the State whether it had a basis to believe that the victim would testify that defendant threatened to kill her. The State said that she had indicated in a written statement that "[defendant] stated throughout the night, if you try to leave, I'll kill you." The trial court then asked the State why it did not ask the victim specifically about the written statement instead of asking an open-ended question that risked her again mentioning the alleged threat against her family. The State answered that since it had admonished her to limit her testimony to threats directed against her, it did not anticipate the victim revisiting the other threats.

¶ 44    At this point, defendant moved for a mistrial. The trial court found that, based upon the victim's demeanor, she purposely violated its earlier ruling that testimony be limited to threats directed to her. However, the trial court denied defendant's motion for a mistrial, finding that a limiting instruction would be the appropriate remedy. When the jury returned to the courtroom the trial judge sustained defendant's objection and admonished the jurors to disregard the victim's answer.

¶ 45    Later, defendant raised this issue in a motion for a new trial. The trial court acknowledged that this issue was "troubling." However, it further noted that the evidence against defendant was strong, and though the introduction of this testimony was error, it was also harmless.

¶ 46    Defendant now argues that the trial court should have granted his motion for a mistrial. For this court to reverse here, we would have to conclude that no reasonable person could agree with the trial court that sustaining defendant's objections and instructing the jury to disregard the objectionable testimony was an adequate remedy. It is presumed that jurors follow the instructions given to them by the trial court. *People v. Boston*, 2018 IL App (1st) 140369, ¶ 103. A mistrial should typically be granted only where the objectionable evidence is "highly prejudicial." See *People v. Pursley*, 284 Ill. App. 3d 597, 605 (1996). That is, striking the evidence is an adequate remedy unless "it is clear the prejudicial effect of the evidence cannot be removed from the jurors' minds." *People v. Jones*, 222 Ill. App. 3d 206, 211 (1991). Here, a reasonable person could agree with the trial court that the testimony at issue did not rise to that level.

¶ 47    First, we note that though this testimony was given at two instances, both were quite brief. In *People v. Watkins*, 2015 IL App (3d) 120882, ¶ 50, the court held that the "brief manner in which other-crimes evidence was presented" mitigated any prejudice accruing to the defendant. In this case, the first time this subject came up, the victim simply said that defendant threatened her children and grandchildren and that he had "connections." On the second occasion, the victim simply reiterated that defendant said if she left he would make sure her family was hurt. No details were given on either occasion. Moreover, in *People v. Nunley*, 271 Ill. App. 3d 427, 432-33 (1995), the court found a limiting instruction insufficient to cure the prejudice flowing from the admission of other-crimes evidence concerning an incident that was "far more grotesque than that which [the defendant] was on trial." Such is not the case here. Indeed, evidence of threats made against the victim's family is far less grotesque than most of the evidence in the case, such as defendant stomping on the victim's feet, kicking her, or striking her face.

¶ 48    Defendant asserts that the State was complicit in eliciting this testimony on the second occasion when it asked the open-ended question, "Were you ever told by the defendant what would happen if you tried to leave?"  It is true that courts have been more likely to declare a mistrial when prosecutorial misconduct is involved.  See *People v. Hood*, 229 Ill. App. 3d 202, 214 (1992). However, the State explained that it did not expect the victim to again mention the threats against her family as it had instructed her not to do so following the first time this testimony was given. A reasonable person could accept this explanation.

¶ 49    Given the brief manner in which the objectionable evidence was presented coupled with the fact that it was arguably less shocking than evidence properly presented to the jury, we cannot conclude that no reasonable person could agree with the trial court that a limiting instruction provided a sufficient remedy here.  Accordingly, we reject defendant's argument on this point.

¶ 50                                    D. *KRANKEL*

¶ 51    Defendant's final contention is that the trial court failed to conduct an adequate inquiry in accordance with *People v. Krankel*, 102 Ill. 2d 181, 189 (1984), after he raised the issue of his counsel's alleged ineffectiveness.  Defendant makes three arguments on this point.  First, he contends that the trial court did not make an adequate inquiry into the underlying facts.  Second, he argues that the trial court applied the wrong standard in assessing his claim.  Third, he complains that the trial court considered his credibility in rejecting his allegations.  This issue is subject to *de novo* review.  *People v. Roddis*, 2020 IL 124352, ¶ 33.

¶ 52    The standards governing such an inquiry are well established:

"New counsel is not automatically required in every case in which a defendant presents a *pro se* posttrial motion alleging ineffective assistance of counsel.  Rather, when a defendant presents a *pro se* posttrial claim of ineffective assistance of counsel, the trial

court should first examine the factual basis of the defendant's claim. If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion. However, if the allegations show possible neglect of the case, new counsel should be appointed." *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003).

A claim "lacks merit" if it is factually or legally insufficient. *Roddis*, 2020 IL 124352, ¶ 61.

¶ 53    An inquiry into a defendant's allegations generally involves "some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation." *Moore*, 207 Ill. 2d at 78. "A brief discussion between the trial court and the defendant may be sufficient." *Id*. Moreover, "the trial court can base its evaluation of the defendant's *pro se* allegations of ineffective assistance on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face." *Id*. In this case, the trial court had a more-than-brief discussion with defendant and defense counsel.

¶ 54    Defendant first contends that the trial court did not make an adequate inquiry concerning his assertion that he wanted to testify and contradict Charlton's testimony regarding the apartment smelling of bleach and the presence of fans and stains on the floor. Before the trial court, defendant also asserted that he wanted to testify regarding the Charlton's testimony that defendant was uncooperative when the police tried to take pictures of defendant's hands. The trial court expressly asked defense counsel to address these issues. Defense counsel explained that he made several strategic decisions regarding what testimony to present and that he refrained from presenting some testimony because it might actually make things worse for defendant. As an example, defense counsel stated that he refrained from attempting to contradict Charlton's testimony about trying to photograph defendant's hands because he believed the State would then rebut defendant's

testimony with testimony from other officers, damaging defendant's credibility. Defense counsel's explanation indicated that these decisions were strategic, and it is unclear to us why a further inquiry would have been necessary. Of course, disagreement over a strategic decision is no reason to appoint new counsel. *Moore*, 207 Ill. 2d at 78. Further, to the extent defendant suggests that the trial court should have inquired of him rather than counsel (actually, the trial court gave defendant an opportunity to add anything else he wanted the trial court to consider), our supreme court has expressly stated that "[t]rial counsel may simply answer questions and explain the facts and circumstances surrounding the defendant's allegations." *Id*.

¶ 55    Defendant asserts that the trial court erred in dismissing some of his claims as trial strategy without inquiring further into the nature of that strategy. Defendant does not expressly discuss these claims. We note that it is permissible for the trial court to consider "the insufficiency of the defendant's allegations on their face." *Id*. Defendant does not explain why the trial court could not do so here regarding any particular claim.

¶ 56    Defendant next complains that the trial court stated, "[I]ssues this gentleman raised just simply don't establish ineffective assistance of counsel." Defendant asserts that this shows that the trial court applied the incorrect standard in that it believed defendant was required to *establish* that counsel was ineffective. Indeed, it is not necessary for a defendant to establish his claim at this stage of the proceedings. *Id*. However, the trial court made a rather lengthy ruling in this case. In the course of so doing, the trial judge explained how many of defendant's complaints related to strategic matters. This is proper. *Moore*, 207 Ill. 2d at 77-78. Further, the trial judge noted that defendant argued that he should have been allowed to testify to things he was not competent to testify to, which is a legitimate basis to reject such claims. See *Roddis*, 2020 IL 124352, ¶ 61 (holding "a trial court must be able to consider the merits *in their entirety* when

determining whether to appoint new counsel on a *pro se* posttrial claim of ineffective assistance of counsel"). As the entirety of the trial court's ruling indicates that it applied the proper law, we find unpersuasive defendant's attempt to elevate to the level of error one isolated statement concerning establishing ineffectiveness.

¶ 57 Finally, defendant complains that the trial court rejected his claim of ineffectiveness based on what it found to be his lack of credibility. As we read the trial court's ruling, it mentioned defendant's lack of credibility in discussing why defense counsel refrained from trying to use defendant's testimony to impeach various witnesses. This would have been a legitimate issue for counsel to consider, and, more importantly, it renders the decision one of trial strategy. It was not error for the trial court to recognize this in its ruling.

¶ 58 In sum, after reviewing the trial court's inquiry into defendant's claim of ineffective assistance of counsel, we find it adequate.

¶ 59                                    IV. CONCLUSION

¶ 60 In light of the foregoing, the judgment of the circuit court of Winnebago County is affirmed.

¶ 61 Affirmed.